# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 98

APRIL TERM, A.D. 2020

July 28, 2020

HB FAMILY LIMITED PARTNERSHIP, a Wyoming limited partnership; ROBBIN D. MOMMSEN, Trustee of the Robbin D. Mommsen Trust dated May 29, 2002, as amended; REYNOLDS POMEROY, II and BETTIE B. POMEROY, Trustees of the Pomeroy Revocable Trust dated November 15, 2017, as amended; HOWARD G. HARDEMAN and ELIZABETH J. HARDEMAN, individually and as Trustees of the Elizabeth J. Hardeman Trust; THE HARDEMAN REVOCABLE TRUST dated March 15, 2016, as amended, by Scott Hardeman and Stephanie Hardeman, Trustees; GAYLE HARDEMAN DECKER and DAVID R. DECKER; DEBORAH J. HARDEMAN; CHRISTINE M. COLEMAN, as Trustee of the Christine M. Coleman Wyoming QPRT II dated January 2011; WILLIAM MURRAY; and MICHAEL N. CHRISTODOLOU and KATHLEEN A. CHRISTODOLOU,

Appellants
(Petitioners),

v.

TETON COUNTY BOARD OF COUNTY COMMISSIONERS,

Appellee
(Respondent),

S-19-0208

and

TETON RAPTOR CENTER,

Appellee
(Intervenor).

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

*Representing Appellant:*
> Matthew W. Kim-Miller and Paula A. Fleck, Holland & Hart LLP, Jackson, Wyoming.

*Representing Appellee:*
> Erin E. Weisman, Teton County Attorney's Office, Jackson, Wyoming.

*Representing Intervenor:*
> Kim D. Cannon, Davis & Cannon, LLP, Sheridan, Wyoming; Leah C. Schwartz, Ranck & Schwartz, LLC, Jackson, Wyoming.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]    The Teton County Board of County Commissioners (Board) approved an application by the Teton Raptor Center (Raptor Center) for an amended conditional use permit (CUP) to expand the use of its property. Nearby landowners and other parties sought judicial review. The district court affirmed and the petitioners appeal. We affirm.

## *ISSUES*

[¶2]    The issues are:

1. Do the appellants have standing?

2. Was the Board's decision to grant the 2018 amendment to the 2008 CUP arbitrary and capricious or contrary to law?

## *FACTUAL BACKGROUND*

[¶3]    The Hardeman family sold 137 acres in Teton County to the Jackson Hole Land Trust (JHLT), which divided the property into several parcels. JHLT sold some of the parcels to finance its purchase and associated preservation of a certain part of that property via a conservation easement. Six structures, collectively referred to here as the Hardeman Barns, are located on a 26.45-acre parcel relevant to this appeal. At times, for clarity, some of the Hardeman Barns are referred to individually, i.e., the North Barn, the South Barn, and the Bull Barn. The Hardeman Barns are historically designated and are considered iconic structures in the town of Wilson.

[¶4]    The Raptor Center leased the 26.45-acre parcel, including the Hardeman Barns, beginning in 2008. The Raptor Center developed a multi-phase plan for operations and use of the property. The Raptor Center is located on the only developable area of the parcel consisting of 2.85 acres. Use of the property is limited by the conservation easements and county zoning regulations. The Raptor Center needed variances and a CUP before it could use the site.

**A.    The Raptor Center's Prior Variances, Conditional Use and Development Permits**

**1.  The 2008 Variances**

[¶5]    The size of the acreage and the location of the structures failed to conform with Teton County's Land Development Regulation (LDR) requirements of a minimum 35-

1

acre parcel for institutional use and 300-foot setbacks. In addition, the property floor area ratio[1] of 0.014 (based on 15,566 square feet of existing structures) was "nonconforming" under Teton County LDRs, which allowed a floor area ratio of only 0.007 (or 8,065 square feet).

[¶6]    The Raptor Center applied for three variances to address these nonconformities. The first sought approval of a floor area ratio of 0.015, which would allow the Raptor Center to take advantage of the existing square footage on the property and add additional square footage for a total of approximately 17,530 square feet of usable non-residential floor area. The second sought approval for a deviation from the required minimum 35 acres (where property is intended for institutional use) to the available 26.45 acres. The third sought permission for a 58-foot setback instead of the required 300-foot setback. The Board granted all three variances in one permit.

### 2. The 2008 Conditional Use Permit

[¶7]    The property was zoned as rural. Use as a raptor center required a CUP. The Raptor Center sought the CUP at the same time it applied for the variances. The Board granted the CUP (and an accompanying development permit), subject to conditions.[2] The 2008 CUP allowed the Raptor Center to operate its "non-profit bird care and education facility" and approved the Raptor Center to:

   a. Have three employees on site, working in the horse barn/house and machine shed;

   b. Provide on-site housing for one of the three employees in the horse barn/house;

   c. Conduct classes and workshops, including flight exhibitions, for less than 100 people;

   d. House a small raptor library;

   e. Host occasional special events for local residents and visitors, also for less than 100 people;

---

[1] Floor area ratio "is the ratio of total building floor area to the area of its zoning lot. Each zoning district has [a floor area ratio] which, when multiplied by the lot area . . . produces the maximum amount of floor area allowable" on the lot. *Wilson Advisory Comm. v. Bd. of Cty. Comm'rs*, 2012 WY 163, ¶ 33, 292 P.3d 855, 864 n.3 (Wyo. 2012).

[2] Those conditions included the submission of a landscaping plan, designation of parking spaces, designation of school bus parking, identification of off-site parking and handicap parking, signage, bear-resistant trash receptacles, and paved access to the pathway to be installed along Highway 22.

f.  Remodel the "machine shed" into a raptor care facility, with cages, weathering yards, flight yards, and a veterinary care room.

### 3. The 2014 Variance and Development Permit

[¶8]    Wyoming Game and Fish regulations required the Raptor Center to segregate resident raptors from wild raptors in rehabilitation.  To comply, the Raptor Center, in 2014, sought permission to build a new chambers facility along the western lot line.  This necessitated an amended development permit and a new setback variance.  The Board approved the amended development permit and the new setback variance.

[¶9]    An amended floor area ratio variance was not required because the square footage was within the parameters previously approved in 2008.[3]  According to the Planning Commission staff report, "[t]he square footage approved in 2008 could be used more efficiently . . . if constructed as a separate building dedicated solely to housing rehabilitating birds."  Further, the development permit recognizes, "596 square feet of floor area will remain under the previously approved" 2008 variance.[4]  Neither the 2014 variance nor the 2014 development permit were appealed.

---

[3] According to the Planning Commission staff report, "[t]his square footage was previously approved under the 2008 variance to Floor Area Ratio."

[4] Additional Planning department communications continued to confirm this understanding of the Raptor Center's available square footage under its floor area ratio calculation.  For example, in 2017, the Raptor Center submitted a "Zoning Compliance Verification" seeking a determination of whether the property's physical development, use, development options, or subdivision complied with the LDRs.  The Raptor Center specifically requested verification:

> Based on our understanding of the LDR, any reduction in existing floor area resulting from the removal or partial removal of buildings creates additional floor area that is available for new or expanded buildings. Please confirm, when calculating [floor area ratio], any new or expanded buildings can incorporate an amount of floor area that is equal to the amount of floor area removed from existing buildings.

In response, the Planning director confirmed:

> The Floor Area Ratio and resulting maximum Floor Area allowance, discussed above, are for nonresidential use on the entire property.  If Floor Area is eliminated from an existing structure, it can be incorporated into the remainder Floor Area allowance for future development of the parcel.

Also, in conjunction with a 2016 amendment to the property's conservation easement previously approved by the Board, the Planning staff issued a formal report stating: "The approved [floor area ratio] of 0.015, pursuant to the 2008 variance, would allow for a maximum of 17,282 square feet" of building space.

**B.      The Raptor Center's Purchase of the Property**

[¶10]  On April 14, 2017, JHLT sold the property to the Raptor Center.  In conjunction with the sale, JHLT encumbered the property with a restrictive covenant that required the Raptor Center to maintain the historic North Barn.  No other structures on the property are subject to the restrictive covenant.

**C.      The 2018 Redevelopment**

[¶11]  In 2017, the Raptor Center decided to implement the final phase of its plan and expand its use of the site.  The expanded use envisioned: new and renovated office space; a flight barn and new bird enclosures; two accessory residential units (providing employee housing for four additional people); restoration of the North Barn (which has been unused for thirty years); use of the North Barn as a hub for raptor conservation and education; and replacement of a deteriorated foundation under the North Barn.  In total, four of the six existing barns would be preserved, and one barn would be relocated off-site.

[¶12]  The Raptor Center applied to amend its 2008 CUP.  Extensive public comment occurred.  Comments, both positive and negative, were submitted in writing and offered at public hearings.

**1.  The 2018 Amendment to the 2008 Conditional Use Permit**

[¶13]  The Planning Commission staff recommended approval of the CUP application contingent on twelve conditions.  The Board then voted 4-0 to approve the application with additional conditions for a total of fourteen conditions.  The amended CUP allows the Raptor Center to construct new and renovated office space, a flight barn, new bird enclosures, and two accessory residential units providing housing for four people.  It requires the removal of a temporary educational programming tent.  Finally, it requires the restoration (including replacement of the deteriorated foundation) and preservation of the North Barn, and it allows the Raptor Center to use the barn for raptor conservation and education.  The conditions include:

1.  The "[m]aximum occupancy on site at any one time is limited to 100 people, including visitors, employees, volunteers, residents and any supplementary staff";

2.  The maximum number of public visitors is 150 per day, apart from four days per month when a total of 200 visitors will be allowed;

3.  A maximum of twelve employees are allowed on the property at any one time;

4

4. Public event hours are limited to 9:00 a.m.–9:00 p.m. for indoor events and 9:00 a.m.–7:00 p.m. for outdoor events;

5. Use is limited to "charitable, educational, administrative and/or community functions consistent with conservation, research, education, and wildlife rehabilitation and the provision of workforce housing"; non-mission events including rental for private parties and events are prohibited;

6. The Raptor Center must submit an annual impact monitoring report to the county and based upon that report, the CUP may be revoked; and

7. Before obtaining a building permit for construction that would utilize the square footage of the South Barn, the South Barn must be relocated off-site.[5]

## D.    Subsequent Proceedings

[¶14] Petitioners, the appellants here, appealed to the district court. The district court concluded that only four of the fourteen petitioners had standing and affirmed the Board's decision. The petitioners appealed.

## *DISCUSSION*

## I.    *Do the appellants have standing?*

[¶15] The petitioners/appellants are individuals, trusts and limited partnerships, that either own property in the area or are members of the Hardeman family. The Board argued in district court that none of the fourteen petitioners had standing. The district court concluded Reynolds and Bettie Pomeroy, as trustees of the Pomeroy Revocable Trust (the Pomeroys), and Michael Christodolou and Kathleen Christodolou (Michael and Kathleen together, the Christodolous) had standing. It found the remaining petitioners did not have standing. The appellants (including those petitioners that the district court found lacked standing) did not appeal the district court's decision on standing. However, the Board argues here that none of the appellants have standing.[6] We will consider standing only as it applies to the Pomeroys and the Christodolous.

---

[5] The remaining conditions are: decommissioning of the septic system and connection to the public sewer; widening and paving a portion of the access drive; approval of a signage plan; placement of bear-resistant trash and recycling in a structure shielding it from view; parking in designated areas; removal of a temporary seasonal tent that had been used for educational programming; foundation repair and upgrade of the North Barn; and the prohibition against demolishing the Bull Barn for two years.

[6] The Board did not cross-appeal but, instead, argued the standing question in its response brief. *See, e.g.*, *Zupan v. Zupan*, 2016 WY 78, ¶ 15, 377 P.3d 770, 776 (Wyo. 2016) ("The distinction between arguing in brief and cross-appealing generally is that a cross-appeal is required to win a change in the judgment,

## A. Standard of Review

[¶16]   The existence of standing is a legal issue reviewed de novo. *N. Laramie Range Found. v. Converse Cty. Bd. of Cty. Comm'rs*, 2012 WY 158, ¶ 22, 290 P.3d 1063, 1073 (Wyo. 2012); *Halliburton Energy Servs., Inc. v. Gunter*, 2007 WY 151, ¶ 10, 167 P.3d 645, 649 (Wyo. 2007). *See also Northfork Citizens for Responsible Dev. v. Park Cty. Bd. of Cty. Comm'rs*, 2008 WY 88, ¶ 6, 189 P.3d 260, 262 (Wyo. 2008).

## B. Analysis

[¶17]   The doctrine of standing is rooted in the separation of powers: "It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm . . . ." *Allred v. Bebout*, 2018 WY 8, ¶ 30, 409 P.3d 260, 268 (Wyo. 2018) (citation omitted). "It is not the function of the [courts] to pass judgment on the general performance of other branches of government." *Id.* (citation omitted). The doctrine, therefore, incorporates three broad principles:

> [T]he general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.
>
> [*Matter of Adoption of*] *L-MHB*, [2018 WY 140,] ¶ 19, 431 P.3d [560,] 567 [(Wyo. 2018)] (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 134 S.Ct. 1377, 1386, 188 L.Ed.2d 392 (2014)).

*Matter of Estate of Stanford*, 2019 WY 94, ¶ 9, 448 P.3d 861, 864 (Wyo. 2019).

---

while arguments to support the judgment can be made without a cross-appeal." (quoting *GOB, LLC v. Rainbow Canyon, Inc.*, 2008 WY 157, ¶ 10, 197 P.3d 1269, 1271 (Wyo. 2008) (citing 18B Charles A. Wright et al., *Federal Practice and Procedure: Jurisdiction* § 4478.6, at 831 (2d ed. 2002)))). The Appellants responded to the Board's standing argument but did not assert that standing should have been raised in a cross-appeal. Without briefing, it is unclear whether the Board's argument that petitioners lacked standing is an argument in "support of the judgment" (if the Board prevails on the argument, the district court's decision is upheld) or whether the argument purports to change the judgment (if the Board prevails, the grounds for affirmance for the judgment would be changed). We address the issue here because, regardless, the underlying judgment remains the same. *See Sinclair Oil Corp. v. Wyoming Pub. Serv. Comm'n*, 2003 WY 22, 63 P.3d 887 (Wyo. 2003) (considering standing when it was not raised in a cross-appeal).

[¶18] Wyoming's long-established test for standing, first articulated in *Brimmer v. Thomson*, was recently revisited in *Allred*:

> First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution.

*Allred*, ¶ 37, 409 P.3d at 270 (quoting *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974)).

[¶19] We have drawn a distinction between "prudential" and "statutory" standing. *Stanford*, ¶ 9, 448 P.3d at 864. Both prudential and statutory standing principles are "vital jurisprudential rules that assist courts in filtering cases." *Matter of Adoption of L-MHB*, 2018 WY 140, ¶ 24, 431 P.3d 560, 568 (Wyo. 2018). The *Brimmer* test evaluates prudential standing. *Stanford*, ¶ 10, 448 P.3d at 864.

> "Statutory standing is a close cousin of prudential standing, and looks to whether '*this* plaintiff has a cause of action under the statute . . . .'" *L-MHB*, ¶ 20, 431 P.3d at 567 (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 n.2, 118 S.Ct. 1003, 1013 n.2, 140 L.Ed.2d 210 (1998) (emphasis in *Steel Co.*)). **Where the question is statutory standing, prudential considerations do not play a role in the standing determination.**

*Stanford*, ¶ 11, 448 P.3d at 864 (emphasis added). Statutory standing, therefore, looks to whether a plaintiff has a cause of action under the statute, not to whether the plaintiff

7

satisfies the *Brimmer* test. *Stanford*, ¶ 11, 448 P.3d at 864; *L-MHB*, ¶ 20, 431 P.3d at 567.

[¶20]  In *Stanford*, the Court considered whether the State had standing to object to the appointment of an administrator of an estate. *Stanford*, ¶ 2, 448 P.3d at 862.  The probate code identifies those parties who may object to the appointment of an administrator.  We determined that the State was not one of those parties identified in the statute and lacked "statutory" standing. *Id.* ¶ 13, 448 P.3d at 865; *see also L-MHB*, ¶ 20, 431 P.3d at 567 (looking to whether the appellants had met the statutory grounds for filing an adoption petition to determine standing).

[¶21]  Judicial review of administrative action is subject to the Wyoming Administrative Procedure Act, which provides:

> Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, **any person aggrieved or adversely affected in fact** by a final decision of an agency in a contested case, or by other agency action or inaction, or any person affected in fact by a rule adopted by an agency, **is entitled to judicial review** . . . .

Wyo. Stat. Ann. § 16-3-114(a) (LexisNexis 2019) (emphasis added).  Accordingly, whether a party has standing to seek judicial review of administrative actions is a question of statutory standing. *See, e.g.*, *N. Laramie Range*, ¶¶ 22–26, 290 P.3d at 1073–74; *Hoke v. Moyer*, 865 P.2d 624, 628 (Wyo. 1993) (appeal of county commissioners' decision); *Northfork*, ¶¶ 13–14, 189 P.3d at 263–64 (same); *Cox v. City of Cheyenne*, 2003 WY 146, ¶ 14, 79 P.3d 500, 506 (Wyo. 2003) (same).

> An aggrieved or adversely affected person is one who has a legally recognizable interest in that which will be affected by the action.  A potential litigant must show injury or potential injury by alleg[ing] a perceptible, rather than a speculative, harm resulting from the agency action.  The interest which will sustain a right to appeal must generally be substantial, immediate, and pecuniary.  A future, contingent, or merely speculative interest is ordinarily not sufficient.

*Wyodak Res. Dev. Corp. v. Wyoming Dep't of Revenue*, 2017 WY 6, ¶ 60, 387 P.3d 725, 738 (Wyo. 2017) (internal quotation marks omitted) (quoting *Jacobs v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2004 WY 136, ¶ 7, 100 P.3d 848, 850 (Wyo. 2004)).

[¶22] In the context of land use planning, to be "aggrieved or adversely affected," one must have "a legally recognizable interest that is or will be affected by the action of the zoning authority in question." *N. Laramie Range*, ¶ 24, 290 P.3d at 1073 (quoting *Hoke*, 865 P.2d at 628). The individual "must have a definite interest exceeding the general interest in community good shared in common with all citizens." *Id.* (quoting *Hoke*, 865 P.2d at 628).

[¶23] We have decided questions of standing in land use actions many times. Most recently, in *Tayback*, we determined the Taybacks had standing to contest the Teton County Board of County Commissioners' decision allowing Four Shadows to use its property as a construction staging site. The Taybacks provided photographic proof that the staging site was in their viewshed. They claimed the dust and noise emanating from the site interfered with their enjoyment of their property. On appeal, we held the alleged harm was "not speculative as the staging site had been in actual operation" and that the Taybacks had "an interest that is greater than the general public's, giving them standing . . . as persons aggrieved and adversely affected in fact" by the Board's decision. *Tayback v. Teton Cty. Bd. of Cty. Comm'rs*, 2017 WY 114, ¶ 19, 402 P.3d 984, 989 (Wyo. 2017).

[¶24] In *N. Laramie Range*, ¶¶ 27–35, 290 P.3d at 1074–76, we considered whether several different parties had standing to challenge the Converse County Board of County Commissioners' approval of a wind energy project. The first party, White Creek Ranch, had standing because it owned property bordering the project and the project "threaten[ed] its scenic views and wildlife habitat and migration." *Id.* ¶ 27, 290 P.3d at 1074. The second party, the Northern Laramie Range Alliance, had standing because one of its members, Ms. Sarvey, owned property "near" land leased for the project and she had concerns about the increased traffic and safety issues the project would cause. "[C]oncerns about traffic, congestion and safety in the area of one's property are perceptible harms for a property owner that distinguish[ed Ms. Sarvey] from the general public."[7] We concluded Ms. Sarvey had standing. *Id.* ¶ 33, 290 P.3d at 1075. In contrast, the third party, the Northern Laramie Range Foundation (NLRF), lacked standing. The NLRF argued it had standing because its "programming, mission and purpose . . . would be adversely affected by the destruction of the scenic views and natural beauty, and the degradation of the environment, natural habitat, wildlife and

---

[7] We noted that the "assertion that her property is 'near' the project does not precisely fall within our precedent finding standing when the litigants asserted their property 'adjoined' or was 'adjacent' to the area of proposed action." *N. Laramie Range*, ¶ 33, 290 P.3d at 1075 (citing *Northfork*, ¶ 10, 189 P.3d at 263; *Hoke*, 865 P.2d at 628). We also noted that Ms. Sarvey's allegations concerning a gravel quarry (which had "nothing to do with the wind energy project") and her complaint that the wind project will "add to the Glenrock area disaster with its 30 enormous towers and blinking lights" did not establish individual harm greater than the general public and did not "aid her . . . in establishing standing." *Id.* ¶ 31–32, 290 P.3d at 1075.

9

biological resources." *Id.* ¶ 35, 290 P.3d at 1076. The NLRF's allegations did not establish a causal relationship between perceived threats and the project and failed to show its "programs would actually be harmed by the wind project." *Id.* We concluded that the NLRF could not distinguish itself from "the general public who enjoys the Northern Laramie Range" and therefore it lacked standing. *Id.*

[¶25] In *Hoke*, the Teton County Board of County Commissioners approved the development of a subdivision with a higher density than was permitted by its zoning category. We determined that Mr. Moyer, an adjacent landowner, had standing to seek judicial review. We said that "[d]oubling the density of adjacent property raises a number of perceptible harms for a[n adjacent] property owner which are different than the harm to the general public, such as increased traffic and congestion." *Hoke*, 865 P.2d at 628; *see also Hirschfield v. Bd. of Cty. Comm'rs of Cty. of Teton*, 944 P.2d 1139, 1143 (Wyo. 1997) ("an adjoining landowner has standing when the effect of the board's decision will be to double the density previously permitted").

[¶26] Similarly, in *Northfork*, ¶¶ 13–16, 189 P.3d at 263–65, the Park County Board of County Commissioners had approved plans for development of a residential subdivision that, like the subdivision in *Hoke*, substantially increased the permitted density. We explained that the "real lesson [of *Hoke* and *Hirschfield*] is that adjoining landowners have standing to appeal land use decisions that result in a substantial increase in the allowed housing density." *Northfork*, ¶ 14, 189 P.3d at 264. "Doubling the density is but one example of a substantial increase sufficient to support standing." *Id.* We held that neighboring landowners had standing because there was an alleged "substantial increase in the allowed housing density," *id.*, and their interest "in preserving views from their homes, and their interests in observing and enjoying wildlife on their own properties, . . . exceed the general public's interest in community good." *Id.* ¶ 16, 189 P.3d at 264.

[¶27] Finally, in *Roe*, potential litigants failed to establish standing to contest the Campbell County Board of County Commissioners' approval of an application to resubdivide a subdivision. Although these litigants alleged the Board had deviated from the proper administrative process and they discussed general concerns about water rights and termination of water and sewer services, they did not describe how they had been aggrieved by the Board's decision. *Roe v. Bd. of Cty. Comm'rs of Campbell Cty.*, 997 P.2d 1021,1023 (Wyo. 2000).

[¶28] Turning to the appellants in this case, we first consider whether the Pomeroys have standing.[8] The Pomeroys' property is adjacent to the Raptor Center and they raise

---

[8] In determining whether a litigant has standing, we generally look to the allegations contained in the complaint. *See, e.g.*, *Allred*, ¶ 49, 409 P.3d at 274 (examining allegations contained in the amended complaint to determine standing). In *Hoke*, we explained that "[t]here are no magic words which must be

concerns—increased noise, additional lighting, and more dogs—directly attributable to increased residential density. They express concerns about the effect of these changes on their property—disruption of peace and quiet and disruption of existing views. Finally, they complain about impacts to wildlife migration and use of neighboring meadows. The Pomeroys' concerns about wildlife migration and the meadows are not distinguishable from those of the general public and do not aid their standing claim. However, like the appellants in *Northfork* and *Hoke*, their concerns about increased density from greater use of the neighboring property and the effect of that greater use on their property exceed the interest of the general public. Accordingly, the Pomeroys are "aggrieved or adversely affected" and have established standing to appeal the Board's decision.

[¶29] Next, we consider the standing of the Christodolous. The Christodolous' home is located 1300 feet from the Raptor Center. They raised concerns about "construction noise, increased employee and resident population density, traffic congestion, parking surface impact, noise and light pollution, skyline blight, and the potential for impact on the wildlife population that resides in and migrates through our area." The Christodolous' concerns about wildlife are not distinguishable from those of the general public. Nevertheless, they have established standing because their other concerns go beyond generalized grievances belonging to the community as a whole. The Pomeroys and the Christodolous were entitled to judicial review of the Board's action by the district court and are entitled to judicial review by this Court. We refer to the Pomeroys and the Christodolous as the Appellants in the remainder of this opinion.

## II. Was the Board's decision to grant the 2018 amendment to the 2008 CUP arbitrary and capricious or contrary to law?

[¶30] The Appellants argue that the Board should have required the Raptor Center to obtain a new variance, and amending the CUP was in violation of the LDRs. The Board

---

pled to establish standing; a party need not state 'I am adversely affected or aggrieved because . . . .'" *Hoke*, 865 P.2d at 628. While standing should be alleged in the complaint (or petition for review in an administrative proceeding), our liberal pleading rules may require examination of the underlying record to determine whether a party has standing. Indeed, in cases where an appellant had challenged board actions regarding land use, we have looked beyond allegations contained in the appeal to the record in support of standing. For example, in *N. Laramie Range*, we examined the record to determine whether the NLRA had standing. We noted the "record indicates NLRA is a limited liability company . . . [and] includes information" regarding its members. *N. Laramie Range*, ¶ 30, 290 P.3d at 1075. We also looked to "an email sent to the county commissioners" to discern facts underlying the position of another appellant with respect to the development at issue. *Id.* ¶ 31, 290 P.3d at 1075. Again, in *Northfork*, we examined the record to determine the "relationship between Northfork and the people it purport[ed] to represent." *Northfork*, ¶ 8, 189 P.3d at 262. Here, the district court examined the record to determine whether individual appellants had standing. We, too, must look to the record to determine whether the Pomeroys or the Christodolous have standing.

11

and the Raptor Center argue that the only issue before the Court is whether the Board's approval of the amended CUP was arbitrary and capricious or contrary to law.

[¶31]  The dispositive issue before the Court is whether the Board's decision to issue an amended CUP was arbitrary and capricious or contrary to law.  We address the question of whether the Raptor Center should have sought a variance and not an amendment to its CUP in the context of whether the amended CUP violated the county's existing LDRs.

## A.  Standard of Review

[¶32]  We review an agency's decision as if it came directly to us, and we give no deference to the district court's decision.  *Hardy v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 42, ¶ 10, 394 P.3d 454, 457 (Wyo. 2017).

[¶33]  The proceedings before the Board were informal, not a contested case adjudicatory hearing.  We review the Board's decision under Wyo. Stat. Ann. § 16-3-114(c)(ii)(A), which directs the Court to set aside an agency decision that is "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  Wyo. Stat. Ann. § 16-3-114(c)(ii)(A).  *See Tayback*, ¶ 13, 402 P.3d at 988; *Wilson Advisory Comm. v. Bd. of Cty. Comm'rs*, 2012 WY 163, ¶ 20, 292 P.3d 855, 861 (Wyo. 2012).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it.  The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Tayback*, ¶ 13, 402 P.3d at 988 (quoting *Wilson*, ¶ 21, 292 P.3d at 861).  An agency's conclusions of law are reviewed de novo.  *Id.* ¶¶ 12–14, 402 P.3d at 987–88.

## B.  Analysis

### 1. Teton County's Land Development Regulations and Conditional Use Permits

[¶34]  Teton County's LDRs set forth three types of available land use permits.  A basic use permit "ensure[s] compliance with the standards of these LDRs for uses that are compatible with the character of the zone in which they are proposed."  LDR § 8.4.1(A).  A CUP **permits "a use that is generally compatible with the character of a zone, but requires [project] specific conditions to limit and mitigate" potential adverse impacts**.  LDR § 8.4.2(A) (emphasis added).  A special use permit is required when the

12

"intensity of a use . . . is inherently incompatible with the character of all zones, but [is] essential to the community and therefore some provision must be made for its existence and operation." LDR § 8.4.3(A). The use permit at issue here is a CUP.

[¶35]  The LDRs require the approval of a CUP application upon finding the application:

1.  Is compatible with the desired future character of the area;

2.  Complies with the use specific standards of Div. 6.1. and the zone;[9]

3.  Minimizes adverse visual impacts;

4.  Minimizes adverse environmental impacts;

5.  Minimizes adverse impacts from nuisances;

6.  Minimizes adverse impacts on public facilities;

7.  Complies with all other relevant standards of these LDRs and all other County Resolutions; and

8.  Is in substantial conformance with all standards or conditions of any prior applicable permits or approvals.

Amendments to existing CUPs undergo the same approval process as new CUPs. When it approved the 2018 amendments to the 2008 CUP, the Board made all eight findings and included an analysis of each in its decision.

[¶36]  The Appellants' arguments are directed at the seventh and eighth findings. They argue that county ordinances do not allow existing variances to be used for new development; rather, the ordinances require new variances for new development, and new variances were not available under the LDRs.[10]  Finding number seven requires

---

[9] Section 6.1.1 sets forth "the principal, accessory, and temporary uses allowed in each zone." LDR § 6.1.1.

[10] Section 8.8.2 of the current LDRs provides:
  B. Applicability.  A variance may be sought for any standard of these LDRs unless the variance would:
    1. Increase maximum density, [floor area ratio], or maximum scale of development;
    2. Allow a prohibited sign;

compliance with County Resolutions, and the Appellants assert that the County Resolutions required a variance and not an amended CUP. *See supra* ¶¶ 30–31, 35; *infra* ¶¶ 43–48. The Appellants also argue that the 2018 CUP did not substantially conform to conditions in the Raptor Center's existing 2008 variances, and therefore the Board could not make finding number eight which requires substantial conformance with existing permits. *See supra* ¶¶ 30–31, 35.

## 2. Finding No. 7

[¶37] The LDRs required the Board to find that the proposed CUP "[c]omplies with all other relevant standards of these LDRs and all other County Resolutions" as a condition of approval. LDR § 8.4.2(C)(7). The Board found the amended CUP:

> 7. *Complies with all other relevant standards of these LDRs and all other County Resolutions; and*
>
> Can Be Made, as Conditioned.
>
> **The application complies with all relevant LDRs and other County Resolutions, as conditioned, pursuant to review of the staff report prepared by the Planning Department and discussion among the Board in public hearing.** A condition requires that prior to installation of any signage, a Master Signage Plan be approved by the Planning Director. As a property in Conflict Priority Area 1, a condition of approval has also been added requiring bear-proof trash and recycling containers.

(Emphasis added.)

[¶38] The Appellants rely on two LDR provisions addressing variances in support of their argument that the Raptor Center was required to seek a new variance for the changes it sought in the amended CUP and that the Board ignored these provisions when

---

3. Allow a prohibited use or allow additional expansion of a nonconforming use;
4. Reduce the requirements of a development option (e.g. required conservation area, minimum lot size, unit type mix);
5. Reduce a requirement where an option for independent calculation of the requirement exists (e.g. housing, development exactions); or
6. Reduce the threshold for review of an application.

LDR § 8.8.2(B).

it approved the CUP. A variance is considered to be a form of "relief" from LDRs. LDR §§ 8.8(B), 8.8.2. The first provision the Appellants rely on is 8.2.13(A), which states:

> Application Type Cannot be Amended. The following permits or approvals **cannot be amended** due to the nature of the findings for approval: Formal Interpretations; Zoning Compliance Verifications; . . . all Relief from the LDRs . . . . **A change to one of these approvals shall be achieved through application for a new approval.**

LDR § 8.2.13(A) (emphasis added).[11] Section 8.8.2(D), the second provision the Appellants rely on, provides:

> Issuance of a variance shall not ensure the approval of any other application. A variance is unique to the special circumstances identified in the findings and does not create precedent. A variance approved for a specific development or use shall only apply to that development or use.

LDR § 8.8.2(D).[12]

[¶39] An agency is in the best position to determine whether a CUP is required. *Bonnie M. Quinn Revocable Tr. v. SRW, Inc.*, 2004 WY 65, ¶ 17, 91 P.3d 146, 151 (Wyo. 2004). At the same time, an "agency's own rules and regulations have the force and effect of law, and an administrative agency must follow its own rules and regulations or face reversal of its action." *Wilson*, ¶ 22, 292 P.3d at 862 (citation and internal quotation marks omitted).

[¶40] We see nothing in the LDR provisions highlighted by the Appellants that requires a new variance here. According to the LDRs, variances and CUPs are used to achieve different ends. The LDRs provide that the "**purpose of a variance is to allow a specific**

---

[11] The 1994 LDRs, in effect at the time the 2008 variance was approved, provided that "[a] Variance may be amended, varied or altered only pursuant to the standards and procedures for the original approval of a Variance . . . ." 1994 LDR § 5160(F).

[12] The 1994 LDRs similarly provided:

> The development for which the Variance was granted shall not be carried out until the applicant has secured all other permits required by these Land Development Regulations. A permit for a Variance shall not ensure that the development approved as a Variance shall receive subsequent approval for other applications for development unless the relevant and applicable portions of these Land Development Regulations are met.

1994 LDR § 5160(E).

15

**deviation** from these regulations that is not contrary to the desired future character for the site when, due to special circumstances of the land, strict application of these regulations would result in undue and unique hardship." LDR § 8.8.2(A) (emphasis added).[13] In contrast, the "**purpose of a conditional use permit is to individually and publicly review the configuration, density, and intensity of a use that is generally compatible with the character of a zone**, but requires additional, site-specific conditions to limit and mitigate effects that may be adverse to the desired character of the zone." LDR § 8.4.2(A) (emphasis added).[14]

[¶41] Other authorities have explained the distinction between CUPs and variances similarly: "The purpose of a [CUP] is to bring flexibility to the rigid restrictions of a zoning ordinance while at the same time controlling troublesome or somewhat incompatible uses by establishing, in advance, standards that admit the use only under certain conditions and standards that must be met." 101A C.J.S. *Zoning and Land Planning* § 256, Westlaw (database updated June 2020). A CUP "is a separate and distinct mechanism from a 'variance.'" *Id.* "[U]nlike a variance, which permits a landowner to use his or her property in a **manner forbidden by an ordinance or statute**, a [CUP] allows an owner to put his or her land to a use **expressly permitted by ordinance**" subject to "conditions necessary to protect the public health, safety, convenience, and property values." *Id.* (emphasis added).

[¶42] The 2018 CUP and the 2008 CUP both authorize the use of the property as a bird rehabilitation and education center. The 2018 CUP amended the 2008 CUP to establish fourteen conditions by which the Raptor Center must abide in its allowable use of the property in view of proposed site improvements. *See supra* ¶ 13. The 2008 variances— approval of a floor area ratio of 0.015, permission to deviate from the required 35 acres for institutional use to the available 26.45 acres, and permission for a nonconforming setback (as amended in 2014)—waive specific requirements in the zoning ordinance. *See supra* ¶¶ 6, 8. The Board found that the proposed changes substantially comply with the previously approved 2008 variances.

[¶43] CUPs have been granted in other cases where landowners have sought to use property for a conditioned purpose like the amended CUP sought by the Raptor Center. *See, e.g.*, *Bd. of Cty. Comm'rs of Teton Cty. v. Mackay Invs., LLC*, 2018 WY 34, ¶ 3, 413 P.3d 1120, 1122, 1122 n.2 (Wyo. 2018) (CUP was used to limit length of stay in campground to "less than 30 days" and to increase the number of trailers allowed at the campground); *Laughter v. Bd. of Cty. Comm'rs for Sweetwater Cty.*, 2005 WY 54, ¶ 38,

---

[13] The Appellants cite no specific zoning ordinance that forbids the proposed changes and, as a consequence, would have required a variance not a CUP.

[14] The Appellants do not dispute that the Raptor Center's institutional use of the property is "generally compatible with the character of a zone."

110 P.3d 875, 886 (Wyo. 2005) (recognizing that the county could impose conditions limiting the duration of use, hours of operation, site improvements, building improvements, parking requirements, and sewer and water requirements, among others, when issuing a CUP); *see also Burns Holdings, LLC v. Teton Cty. Bd. of Comm'rs*, 272 P.3d 412, 416 (Idaho 2012) (A CUP concerns the proposed use of property and cannot be used to obtain a waiver of zoning ordinance requirements such as the maximum height of buildings.).

[¶44] "A variance approved for a specific development or use shall only apply to that development or use." LDR § 8.8.2(D). The fact that the Raptor Center sought to expand its current use of the property does not equate to a change of use. Consequently, expanding its use does not mean that the Raptor Center needed a variance.[15]

[¶45] The Board relied upon the Planning Commission reports finding that an amendment to the CUP was the appropriate method to address the Raptor Center's proposed expansion. The Board's reliance on those reports, and its decision to approve the amendment to the CUP, was reasonable and did not violate the LDRs.

### 3. Finding No. 8

[¶46] The LDRs required the Board to find that the use proposed in the CUP was "in substantial conformance with all standards or conditions of any prior applicable permits or approvals" before it could approve the amended CUP. LDR § 8.4.2(C)(8). The Board found the amended CUP:

> 8. *Is in substantial conformance with all standards or conditions of any prior applicable permits or approvals.*
>
> Can Be Made, as Conditioned.
>
> Relevant conditions from the 2008 Conditional Use Permit . . . have been added as conditions of this approval to provide consistency with this amendment. [The 2018 amended CUP] is and remains in conformance with the relevant 2008 Variances . . . . Since the 2008 Variances were issued in association with the Teton Raptor Center's institutional use and [the 2018 amended CUP] is an amendment of that

---

[15] The Appellants also argue that the amended CUP is really a "use variance," and under the LDRs, use variances would not be permitted. The LDRs do not define, provide for, or otherwise recognize a distinct "use" category of variances. Rather, "uses" of properties are addressed by use permits, described above. *Supra* ¶ 34.

17

existing use, the variances were found to be established, ongoing, effective, and in operation. The Board reviewed the terms and conditions of the 2008 Variances and the plain language of the 2008 Variance permits. **The Board was able to find that this application is in substantial conformance with the 2008 Conditional Use Permit and the 2008 Variance Permits and all other standards or conditions of any prior applicable permits or approvals.**

(Emphasis added.) The Appellants argue that the amended CUP is not in substantial conformance with the 2008 variance.

### 4. Compliance with the Allowances in the 2008 Variance

[¶47] The 2008 variance allowed a 58-foot setback, a 0.015 floor area ratio, and the institutional use of a base site area of 26.45 acres. *See supra* ¶ 6. The Appellants argue that the amended CUP did not comply with the floor area ratio of the 2008 variance because it applied square footage allocated in that variance to different square footage in its new development.

[¶48] The district court held that because the substantive provisions of the variance have gone unchanged over time and remain in effect, the Board's finding of substantial conformance with the material terms of the variance was correct. We agree. The 2018 CUP did not change the allowances in the 2008 variance. The setback, the floor area ratio, and the base site area remain as they were in 2008.[16]

[¶49] The Appellants argue that the amended CUP allows the floor area to be used in a manner that is different from the way it was used in 2008, and this is a material change. Consequently, they argue the 2018 CUP cannot be in substantial compliance with the 2008 variance.[17]

[¶50] The Planning staff determined, and the Board confirmed, that the floor area ratio of 0.015 in the 2008 variance yielded 17,524 square feet of space for non-residential use. The Appellants contend that the "2008 variances were granted to permit a 4,037 sq. ft.

---

[16] Under the county's zoning laws, workforce housing does not count towards floor area ratio or increased density restrictions in the LDRs. The two additional housing units for a total of four employees do not count in the floor area ratio calculation.

[17] The Appellants also argue that to change the allocation of the floor area ratio, the Raptor Center needed to obtain a new variance. This argument is, in part, addressed in the preceding section where we conclude that the Raptor Center was not required to seek a new variance. Further, because, as we explain here, the Board was reasonable when it concluded that the Raptor Center could reallocate the floor area to different structures, a new variance was not required.

bird care and education facility—full stop." They argue that regardless of the floor area ratio yield in the 2008 variances, vacant square footage must remain vacant absent a new variance.

[¶51] To support their argument, the Appellants cite cases from other jurisdictions in which petitioners sought to expand the scope of existing variances. Those cases are unpersuasive largely because they address questions where the language of the permits and local ordinances expressly limit the proposed development. *See CDK Rest. v. Krucklin*, 500 N.Y.S.2d 339 (App. Div. 1986) (affirming board's decision to deny construction of a deck where the existing variance provided that the area be "left open and une[n]cumbered" by "restaurant . . . activity"); *L & G Assocs., Inc. v. Zoning Bd. of Appeals of City of Danbury*, 673 A.2d 1146, 1148 (Conn. App. Ct. 1996) (development of a "west parcel" was prohibited where the variance allowed no use of the west parcel); *DiGiovanni v. Bd. of Appeals of Rockport*, 474 N.E.2d 198, 204 (Mass. App. Ct. 1985) (affirming board's rejection of construction that did not comply with the variance allowing "a 'cluster' development of eighteen units"); *O & G Indus., Inc. v. Bridgeport Zoning Bd. of Appeals*, No. CV166059045S, 2017 WL 1311666, at *1 (Conn. Super. Ct. Mar. 13, 2017) (affirming cease and desist order to prohibit concrete crushing plant where the variance permitted a junk yard and stated "[t]he development . . . shall be substantially in accord with the plans submitted"); *Clark Cty. Bd. of Comm'rs v. Taggart Constr. Co.*, 615 P.2d 965, 968 (Nev. 1980) (expanded uses were not within scope of the existing variances because they were "not expressed" when the variances were granted).

[¶52] Here, the 1994 LDRs (in effect at the time the 2008 variance issued) provided "[a]ll conditions imposed upon any Variance . . . shall be expressly set forth in the granting" of the variance. 1994 LDR § 5160(C)(2). The language of the 2008 variance imposed no conditions on the use of available floor area. Conjointly, the Board, the Planning staff, and the Raptor Center have long interpreted the unused floor area ratio to be included in the floor area available for use. *See supra* note 4.

[¶53] The conclusion that the amended CUP substantially conforms with the 2008 variance, including the floor area ratio, is supported by the record and the Board's longstanding interpretations of the Raptor Center's floor area availability.

## 5. Compliance with the "Limitations and Conditions" Language in the 2008 Variance

[¶54] The 2008 variance contained a "Limitations and Conditions" provision. The Appellants contend that the amended CUP does not substantially conform with the "Limitations and Conditions" provision. Their argument hinges on their interpretation of the language of that provision.

[¶55]   The provision states that the "[v]ariance permits are associated with the remodel of the machine shed and use of the Hardeman Barn property, as approved in Development Permit DEV 08-0006 and Conditional Use Permit CUP 08-0001."

[¶56]   Rules of statutory construction are applied to the language of zoning regulations and permits issued pursuant to those regulations.  *See Bd. of Cty. Comm'rs of Teton Cty. v. Crow*, 2003 WY 40, ¶ 45, 65 P.3d 720, 734 (Wyo. 2003); *Snake River Brewing Co., Inc. v. Town of Jackson*, 2002 WY 11, ¶ 29, 39 P.3d 397, 408 (Wyo. 2002); *Hochstein v. Cedar Cty. Bd. of Adjustment*, 940 N.W.2d 251, 256 (Neb. 2020) ("When interpreting zoning regulations, an appellate court applies the same rules utilized in statutory interpretation."); *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244, 1248 (Colo. 2000) (rules of statutory construction apply in the interpretation of statutes and local government resolutions and ordinances).

> [The] Court must endeavor to find the reasonable intent of the drafters.  We begin by examining the ordinary and obvious meaning of the words employed according to their arrangement and connection.  When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and need not invoke our longstanding rules of statutory construction.
>
> *Best* [*v. Best*], 2015 WY 133, ¶ 8, 357 P.3d [1149,] 1151–52 [(Wyo. 2015)] (citations omitted).  "All statutes must be construed in pari materia; and in ascertaining the meaning of a given law, all statutes relating to the same subject or hav[ing] the same general purpose must be considered and construed in harmony." *Thunderbasin Land, Livestock & Inv. Co. v. Cty. of Laramie Cty.*, 5 P.3d 774, 779 (Wyo. 2000); *see also In re Estate of Meyer*, 2016 WY 6, ¶ 21, 367 P.3d [629,] 636 [(Wyo. 2016)]; *Wyo. Cmty. Coll. Comm'n [v. Casper Cmty. Coll. Dist.*], 2001 WY 86, ¶ 16, 31 P.3d 1242, 1249 (Wyo. 2001).  "Moreover, we strive to avoid an interpretation that produces an absurd result, or that renders a portion of the statute meaningless." *Seherr-Thoss v. Teton Cty. Bd. of Cty. Comm'rs*, 2014 WY 82, ¶ 19, 329 P.3d 936, 945 (Wyo. 2014) (citations omitted); *see also Powder River Basin Res. Council v. Wyo. Oil & Gas Conservation Comm'n*, 2014 WY 37, ¶ 42, 320 P.3d 222, 234 (Wyo. 2014).

*City of Torrington v. Smith*, 2016 WY 126, ¶ 7, 386 P.3d 336, 339–40 (Wyo. 2016).

[¶57] The Appellants contend that the "Limitations and Conditions" language is unambiguous and inextricably fixes the conditions contained in the 2008 CUP to the 2008 variance. Therefore, the Appellants argue, the 2018 amendments to the CUP cannot substantially conform to the 2008 variance because they change the 2008 CUP. Under this interpretation, any amendment to the 2008 CUP would fail to conform to the 2008 variance.

[¶58] While the "Limitations and Conditions" provision could be read as suggested by the Appellants, we decline to accept this interpretation, because it would render the LDR provision allowing for amendments to CUPs meaningless. "We do not interpret statutes in a way which would render any statutory language meaningless." *Matter of Estate of Britain*, 2018 WY 101, ¶ 28, 425 P.3d 978, 987 (Wyo. 2018); *Wyodak*, ¶ 26, 387 P.3d at 732.

[¶59] The "Limitations and Conditions" language states that the 2008 variances "are associated with the remodel of the machine shed and **use of the Hardeman Barn property, as approved in [the 2008 Development Plan and CUP]**." (Emphasis added.) The plain language of the provision limits the variance to the **use of the property**. Its reference to the 2008 CUP and the development plan does not tie the variances to the 2008 CUP but to the use allowed by the CUP. Amending the conditions attached to the use under the LDRs allowing amendments to CUPs does not create nonconformance with the variance. LDR § 8.4.2(C).

[¶60] The institutional use of the property remains the operation of the Raptor Center. The Board could reasonably conclude that the amended CUP substantially complied with the requirements of the 2008 variance. The 2008 variance continues to apply to the Raptor Center's institutional use of the property.

## *CONCLUSION*

[¶61] The Pomeroys and the Christodolous have standing to appeal the Board's decision. The Board reasonably concluded that the amended CUP complied with all other relevant standards of these LDRs and all other County Resolutions and that the amended CUP substantially complied with the requirements of the 2008 variance. This decision was not arbitrary and capricious and did not violate the law. We affirm.