# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 95

**APRIL TERM, A.D. 2022**

**August 5, 2022**

JAMES J. JOLOVICH,

Appellant
(Petitioner),

v.

BOARD OF COUNTY
COMMISSIONERS OF PARK
COUNTY,

Appellee
(Respondent).

S-22-0015

*Appeal from the District Court of Park County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*

> Laurence W. Stinson and Scott Stinson of Stinson Law Group, P.C., Cody, Wyoming. Argument by Mr. Laurence W. Stinson.

*Representing Appellee:*

> Mallory B. Riley, Deputy and Prosecuting Attorney, Park County Attorney Attorney's Office, Cody, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    Tri County Telephone Association, Inc. (TCT) applied for a special use permit to construct a 150-foot broadband communications tower in Park County. James J. Jolovich objected on grounds the tower would obstruct his view and have negative health impacts. The Board of County Commissioners of Park County approved the application, and Mr. Jolovich sought judicial review. The district court affirmed the Board's action, and we likewise affirm.

## *ISSUES*

[¶2]    Mr. Jolovich presents two issues on appeal, which we restate as:

> 1.  Did the Board have a rational basis for approving TCT's application for a special use permit to construct its broadband communications tower?
>
> 2.  Did the Board act arbitrarily or capriciously in approving TCT's application without considering alternative sites for the proposed tower?

## *FACTS*

[¶3]    On August 31, 2020, TCT applied to the Park County Planning and Zoning Department (Planning Department) for a special use permit (SUP) "to construct a 150' self supporting communication tower to provide broadband internet services to underserved areas of Park County." The tower was to be constructed on a Park County property owned by George Farms and was called the "George Tower." TCT obtained the funding for the project through the federal CARES Act (15 U.S.C.A. §§ 9001-9141 (2022)) and informed the Planning Department that "[e]xpediting the approval process [f]or this project is vital to meet the deadline and to access the needed funding, which is part of the ConnectWyoming initiative." The George Tower was one of four towers TCT planned to construct, each subject to a separate permit. In response to an inquiry from the Planning Department concerning the services the towers would provide, a TCT representative wrote:

> We won't be installing 5G services, as that term is typically used by cell carriers for their mobile data technology. Our service is a fixed point to multipoint wireless service for fixed broadband internet and will be utilizing the 3.6 GHz CBRS spectrum. So what that essentially means is that the internet will be sent wirelessly, on a special frequency, from an access point on our tower to small dishes we install on customers' houses. The signal cannot be used by cell phones for mobile

1

data. It's basically the same internet that we provide now, but we are not using a cable in the ground. Depending on the internet package a customer gets, they can get 5/3 mbps all the way up to 50/5 mbps (and sometimes more, depending on what a customer is willing to pay for). It's not quite as fast as fiber optic internet, but it's about as fast as you can get wirelessly.

That being said, we are preparing some of the towers to maybe someday have co-location for cell service (meaning if Verizon or AT&T approach us about it, we may rent them space) but there are no active contracts and we do not expect to have any real influence on the types of services that these carriers may be looking to put on the tower in the future.

[¶4]    In Park County, a SUP requires review and approval of the Planning and Zoning Commission (Planning Commission), followed by review and approval of the Board of County Commissioners (Board). As part of that process, the Planning Department reviewed the application and submitted a staff report to the Planning Commission and the Board. That report found:

- "The tower will not be tall enough for beacons, does not need to be guyed, does not emit radiation, does not emit noise. As a result, there will be minimal to no visual impact."

- "[I]mpacts of the use have been sufficiently addressed and suggest that the proposed use will be in harmony and compatible with surrounding land uses and with the neighborhood and will not create a substantial adverse impact on adjacent properties."

- "The proposed use is a communication tower enclosed within a 40' x 40' compound fence. No aspects of the proposed use are expected to impact surrounding agricultural uses, including those existing on the property. The location of the compound does not appear to be land historically used for production agriculture. No pests or domestic pets are expected to be related to this use. No solid waste will result from this use. Irrigation facilities will not be impacted by this use." and

- "[T]he proposed use complies with the requirements of the Agricultural Overlay District regulations."

[¶5]   On October 20, 2020, TCT's George Tower application came before the Planning Commission. The meeting minutes reflect that Richard Wardell of TCT was present and reported the tower would serve approximately seventy-five homes and that the area's geography prevented existing towers from providing the required service. Mr. Jolovich also appeared and objected to the location and height of the proposed tower. He commented that the tower would obstruct his view of Heart Mountain and create electrical fields that would negatively impact his health. He asked that an alternative location be considered and asserted that the tower did not have to be as tall as planned to provide the needed service.

[¶6]   Mr. Wardell responded that TCT could potentially lower the tower's height, but it "could lose the ability to have a multi-tenant capability and lose some of the reach for those furthest from the tower." The minutes summarized Mr. Wardell's response to a comment that an alternative location had already been approved for a tower like that proposed:

> Richard Wardell said he is not aware of any approved towers. They have done their due diligence in looking at the terrain and vegetation in considering the spectrum of their use. The height is so they can get a clear line of sight to customers and the tower requires vertical separation for additional tenants. He added that many other people were not interested in speaking with TCT. They do use some utilities and topographic maps to calculate paths; considering the highs, lows and vegetation, which limits the locations. Then finding a landowner that is willing to discuss the concept is difficult.

[¶7]   During the Planning Commission's discussion, a commissioner moved to continue the public hearing to determine if there were other viable locations for the proposed tower. That motion failed, and the Planning Commission ultimately approved a resolution recommending that the Board of County Commissioners approve TCT's SUP.

[¶8]   On November 10, 2020, TCT's application came before the Board. The Board heard from a Planning Department representative and took public comment. The Planning Department's representative gave an overview of the project consistent with the Department's report and added:

> I will mention something we didn't have in the staff report. In our regs, it does specifically mention, for major utility use, that those, those, proposed projects should not be oversized and need to be minimized in size to not affect any agriculture. We think that has been met. We think this use has not been oversized and therefore will not impact any agriculture.

3

[¶9]   During public comment, Mr. Jolovich expressed his concerns that the proposed tower would obstruct his view of Heart Mountain, and that it would have negative health impacts on him. He again asked that alternative locations be considered. The Board members discussed the concerns with the tower and its location and then voted three to two to approve the SUP. The permit was issued that day for a "150' tall self-supporting communication tower to provide broadband internet services to underserved areas of Park County."

[¶10]   Mr. Jolovich filed a petition for judicial review of the Board's action, and the district court affirmed. He then filed a notice of appeal to this Court.

## STANDARD OF REVIEW

[¶11]   "We review an agency's decision as if it came directly to us, and we give no deference to the district court's decision." *HB Fam. Ltd. P'ship v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2020 WY 98, ¶ 32, 468 P.3d 1081, 1091 (Wyo. 2020) (citing *Hardy v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 42, ¶ 10, 394 P.3d 454, 457 (Wyo. 2017)). The Board's action was taken in an informal proceeding, not after a contested case proceeding. Our standard of review is therefore under Wyo. Stat. Ann. § 16-3-114(c)(ii)(A), which directs the Court to set aside an agency decision that is "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Wyo. Stat. Ann. § 16-3-114(c)(ii)(A) (LexisNexis 2021). *See Tayback v. Teton Cnty. Bd. of Cnty. Comm'rs.*, 2017 WY 114, ¶ 13, 402 P.3d 984, 988 (Wyo. 2017); *Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 2012 WY 163, ¶ 20, 292 P.3d 855, 861 (Wyo. 2012).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*HB Fam. Ltd. P'ship*, 2020 WY 98, ¶ 33, 468 P.3d at 1091 (quoting *Tayback*, ¶ 13, 402 P.3d at 988).

## DISCUSSION

*I. The Board had a rational basis to conclude that the George Tower was not oversized, and thus its approval of TCT's application did not violate Park County development regulations.*

4

[¶12]   Because the proposed George Tower was over thirty-five feet in height, the Park County development regulations classified it as a major utility. As a major utility being constructed in an "agricultural overlay district," or "AGO district," the tower had to comply with the following regulation:

> Major utility facilities shall be sized to serve existing or planned uses within the AGO district and shall not be over-sized so as to induce or facilitate additional development within the AGO district. Major utilities shall be sited to minimize the disruption of agricultural operations.

*Park Cnty. Wyo. Dev. Standards and Regs.*, ch. IV, § 5(c)(4) at 156 (2015).

[¶13]   Mr. Jolovich contends this regulation requires that a major utility be sized for its current or planned use, and no larger, and that the Board did not have sufficient information to determine whether the George Tower was sized for its planned and approved use of providing broadband service. We need not determine whether Mr. Jolovich's interpretation of this regulation is accurate, because, even if we assume it is, the Board had sufficient information to conclude that the tower was not oversized for its approved use.[1]

[¶14]   The planning staff advised the Board that it had assessed the project under the regulation against oversizing and concluded the tower was not oversized. Additionally, the record contains Mr. Wardell's explanation that because of the area's topography, the tower height was necessary to reach all the intended recipients of the broadband service. This information was sufficient to provide the Board with a rational basis to conclude that the tower was not oversized. *HB Fam. Ltd. P'ship*, 2020 WY 98, ¶ 33, 468 P.3d at 1091 ("The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.").

---

[1] Although Mr. Jolovich disputed the tower's necessary height before the Board, he did not object to it on the basis that it violated the regulation against oversizing a major utility. The Board does not contend in its briefing to this Court that we should not consider Mr. Jolovich's argument as new on appeal. Nonetheless, because this precise issue was not raised before the Board, the record contains no indication of how the Board would interpret its oversizing regulation. Since an interpretation is not required for our disposition, we decline to offer one under these circumstances. *See N. Laramie Range Found. v. Converse Cnty. Bd. of Cnty. Comm'rs*, 2012 WY 158, ¶ 37, 290 P.3d 1063, 1077 (Wyo. 2012) ("[I]t is also 'settled that we defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules.'") (quoting *Off. of State Lands and Invs. v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 11, 252 P.3d 951, 954 (Wyo. 2011)).

***II. The Park County regulations do not require the Board to consider alternative sites for a project before approving a special use permit, and it therefore did not act arbitrarily or capriciously in approving TCT's application without considering alternative locations for the proposed tower.***

[¶15]  Mr. Jolovich next asserts that the Board was presented with an alternative location for the proposed tower that would not have interfered with his view of Heart Mountain and would have mitigated the potential adverse health impacts on him. He thus contends the Board should have continued the hearing to allow for further investigation, and he argues its approval of TCT's application without doing so was arbitrary and capricious.

[¶16]  In *Tayback*, 2017 WY 114, ¶ 31, 402 P.3d at 992, opponents of a permit approval made a similar argument.

> The Taybacks assert the Board acted arbitrarily and capriciously by failing to consider alternative sites for Four Shadows' construction storage/staging operation. In support of their argument, the Taybacks point out that the planning staff broached the possibility of moving the site farther away from residential areas. The discussion at the public hearing also addressed potential alternative sites. In the end, the staff recommended approval of a permit allowing Four Shadows to operate at the Granite Ridge site, and the Board did not address alternative sites when it issued its findings of fact, conclusions of law and order.

*Id.*

[¶17]  We rejected the argument because the applicable development regulations did not require consideration of alternative sites.

> The Taybacks do not direct us to any provision in the LDRs or Master Plan that requires the Board to consider, or make findings about, alternative sites for construction storage/staging. Without some authority requiring the Board to consider alternative sites, we cannot say that the Board acted contrary to law or arbitrarily and capriciously by failing to do so.

*Tayback*, 2017 WY 114, ¶ 33, 402 P.3d at 992.

[¶18]  The same is true here. The only authority Mr. Jolovich points to in support of his argument is Chapter IV, Section 4(d) of Park County's development regulations, which provides that "[s]pecial uses are permitted provided the use is reviewed and adverse

impacts are identified and mitigated." This provision does not mandate consideration of alternative sites. It requires only that adverse impacts be identified and mitigated, and the record shows that was done in this case.

[¶19] As to the visual impacts of the proposed tower, the staff report found that because the tower will not require beacons, does not need to be guyed, does not emit radiation, and does not emit noise, "there will be minimal to no visual impact." The report further concluded that the "impacts of the use have been sufficiently addressed," and the tower "will not create a substantial adverse impact on adjacent properties." Finally, the record shows that the tower's site had been chosen based on topographic considerations and the need to reach all intended recipients of the broadband service.

[¶20] The record was sufficient to provide the Board with a rational basis to conclude that the adverse visual impacts of the proposed tower were considered and mitigated. The regulations required no more than that, and we therefore cannot find that the Board acted arbitrarily or capriciously in approving TCT's without considering alternative sites to address Mr. Jolovich's concerns with the tower's visual impact.[2]

[¶21] As to the alleged adverse health impacts of the proposed tower, the information that Mr. Jolovich provided the Board was not specific to or tailored to the proposed tower. More importantly, the information concerned the health impacts of cellular towers, and that is not the use the Board approved.[3] The approved permit authorized only a "150' tall self-supporting communication tower to provide broadband internet services to underserved areas of Park County." We thus cannot find that the Board acted arbitrarily or capriciously in approving TCT's application without further investigation into the alleged health impacts of cellular towers.[4]

---

[2] In his reply brief, Mr. Jolovich argues that the Board acted arbitrarily and capriciously in allowing TCT's funding deadline to rush its decision without further investigation into alternative sites. The record shows there was a need for the broadband service TCT's proposed tower would provide, and the Board therefore had a rational basis to be concerned with funding for and timely completion of the project. Additionally, that the funding deadline was a concern does not change the fact that the Board was not required to consider alternative sites and that it had a rational basis to conclude that adverse visual impacts had been mitigated.

[3] We understand that Mr. Wardell justified the proposed tower's height in part to accommodate cellular service tenants. At the time of the Board's approval, however, that potential use remained speculative.

[4] We also note, though it is not something we need to resolve, that the Board's ability to restrict a telecommunications tower based on alleged health impacts may be limited to requiring that the tower be licensed by the Federal Communications Commission. *See* 47 U.S.C. § 332(c)(7)(B)(iv) ("No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions."); *see also Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811-12 (10th Cir. 2021).

## *CONCLUSION*

[¶22]  The record demonstrates that the Board had a rational basis for concluding that TCT's proposed broadband tower was not oversized, and the Park County development regulations did not require it to consider alternative sites for the tower. Affirmed.