# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 31

APRIL TERM, A.D. 2023

April 17, 2023

MONAGHAN FARMS, INC.,

Appellant
(Petitioner),

v.

THE BOARD OF COUNTY COMMISSIONERS
OF ALBANY COUNTY, WYOMING,

Appellee
(Respondent),

and

CONNECTGEN ALBANY COUNTY LLC,

Appellee                                         S-22-0127, S-22-0128
(Intervenor).

MICHAEL and MARDEE AANONSEN;
MARJORIE and JACK BEDESSEM; SALLY
BIEGERT; EDWARD and MARY ANN
BOSANAC; STEPHANIE and BRIAN CONES;
JOHN M. and SUSAN S. DAVIS;
LESLIE-ANNE FAIRESHIRE and ROBERT
KRUMBERGER; KEVIN and KARMEN FISKE;
THOMAS and CLAUDIA HAMP; NATALIA
JOHNSON and NICHOLAS OCEANAK;
CHRISTINE KRATT; CHRISTOPHER KELLY;
ANTHONY and JENNIFER KIRCHHOEFER;
DYLAN and MISSY KRAMSCHUSTER;
STEVE KRAMSCHUSTER; JILL and STEVE
LEINEN; PAUL MATOSKY and RUTHIE
SORENSEN; ALAN MINIER; MARY F.

MOORE; PAUL and LYNN MONTOYA; LELAND and KAREN SCHERTZ; RUTH and STEVE SOMMERS; KIRK STONE; DENISE WALKUSCH; MICHELLE WHITE; MIRIA WHITE; RONALD WILSON; TOM and KELLY WOLFE,

Appellants
(Petitioners),

v.

THE BOARD OF COUNTY COMMISSIONERS OF ALBANY COUNTY, WYOMING,

Appellee
(Respondent),

and

CONNECTGEN ALBANY COUNTY LLC,

Appellee
(Intervenor).

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

***Representing Appellant, Monaghan Farms, Inc.:***
 J. Mark Stewart, Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Mr. Stewart.

***Representing Appellants, Michael and Mardee Aanonsen; Marjorie and Jack Bedessem; Sally Biegert; Edward and Mary Ann Bosanac; Stephanie and Brian Cones; John M. and Susan S. Davis; Leslie-Anne Faireshire and Robert Krumberger; Kevin and Karmen Fiske; Thomas and Claudia Hamp; Natalia Johnson and Nicholas Oceanak; Christine Kratt; Christopher Kelly; Anthony and Jennifer Kirchhoefer; Dylan and Missy Kramschuster; Steve Kramschuster; Jill and Steve Leinen; Paul Matosky and Ruthie Sorensen; Alan Minier; Mary F. Moore; Paul and Lynn Montoya; Leland and Karen Schertz; Ruth and Steve Sommers; Kirk Stone; Denise Walkusch; Michelle White; Miria White; Ronald Wilson; Tom and Kelly Wolfe:***
 Mitchell H. Edwards and Philip A. Nicholas, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Edwards.

*Representing Appellee, the Board of County Commissioners of Albany County, Wyoming:*

      Matthew E. Ayres, Jennifer M. Curran, and E. Kurt Britzius, Albany County & Prosecuting Attorney's Office, Laramie, Wyoming.  Argument by Mr. Ayres.

*Representing Appellee, ConnectGen Albany County LLC:*

      Timothy M. Stubson, Crowley Fleck PLLP, Casper, Wyoming; O'Kelley H. Pearson, Parker Poe Adams & Bernstein LLP, Atlanta, Georgia.  Argument by Mr. Stubson.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    The matter before us arises from two separate cases consolidated on appeal. ConnectGen Albany County LLC (ConnectGen) applied for a Wind Energy Conversion System (WECS) permit to construct a wind farm on land in Albany County.  The Board of County Commissioners of Albany County (Board) approved the application.  Nearby property owners (Landowners) and Monaghan Farms, Inc., (Monaghan Farms) sought judicial review, and the district court affirmed.  The Landowners and Monaghan Farms (collectively Appellants) appeal.  We affirm.

## ISSUES

[¶2]    We consolidate and rephrase the issues as follows:

>    1.    Was ConnectGen required to obtain a conditional use permit in addition to the WECS special use permit?
>
>    2.    Was the Board's approval of the WECS special use permit application arbitrary and capricious?
>
>    3.    Was the Board's approval of the WECS special use permit a taking of private property in violation of Wyo. Const. art. 1, § 32?

## FACTS

[¶3]    On March 5, 2021, ConnectGen submitted its application for a WECS special use permit to the Board seeking approval to construct a 120-turbine wind farm, with accompanying infrastructure, on approximately 26,000 acres of land in southeastern Albany County (the Project).  The Project area is comprised of state and private land zoned as Agricultural.  It abuts property also zoned Agricultural owned by Monaghan Farms and is surrounded by other land zoned Agricultural and Rural Residential, some of which is owned and/or occupied by the Landowners.

[¶4]    On April 6, 2021, the Board scheduled a hearing for public comment on June 1, 2021.  Written comments were accepted through June 1, and additional public comment was received at the hearing.  After the hearing, the Board submitted written questions to ConnectGen, seeking additional information.  ConnectGen's responses were made public through the County's website.

[¶5]    The Board held a special meeting on July 13, 2021.  At that meeting the Board, on oral motion, approved ConnectGen's WECS permit, subject to the following conditions:

1.     Turbines will be setback one mile from existing non-participating residential dwellings.  This setback may be waived by the affected property owner . . . in accordance with the Albany County Zoning Resolution (ACZR), Chapter 5, Section 12, G, 7, i;

2.     Fire suppression systems will be installed in all turbines;

3.     Blasting will only occur during daylight hours;

4.     If a non-participating property owner suspects noise levels exceed 55 dBA at the property lines (ACZR, Chapter 5, Section 12, G, 3) and this is brought to the attention of ConnectGen (or the current owner of the project) or Albany County, ConnectGen or current owner will take steps to confirm a violation of the standard and rectify it upon its confirmation;

5.     Turbines will be setback 1.5 times the height of the nacelle[1] plus the diameter of the turbine blades from public roads;

6.     If an Aircraft Detection Lighting Systems (ADLS) is not approved for this project by the Federal Aviation Administration, ConnectGen (or the current project owner) shall ask for a variance from the Board of County Commissioners for any affected towers;

7.     A County Road use and maintenance agreement shall be approved by the Board of County Commissioners prior to any development within the project boundaries (ACZR Chapter 12, G, 9);

8.     All commitments made as part of this application and these conditions will be passed on to future project owners; and

---

[1] "The motion of wind rotates the large blades of the turbine, which in turn rotates a rotor in the square box at the top of the turbine, called a *nacelle*.  London Gibson, *The Indianapolis Star*, 11 Aug. 2021." *Nacelle*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/nacelle (last visited Apr. 6, 2023).

9.     ConnectGen will work with any property owner claiming to be affected by shadow flicker in excess of the industry standard of 30 hours per year.

The Albany County Planning Office (Planning Office) sent a letter to ConnectGen "to confirm that ConnectGen Albany County's . . . Rail Tie Wind Project Application WEC-01-21 was approved by the [Board] on July 13, 2021, with conditions." By letter, ConnectGen accepted the conditions imposed in the WECS permit. Other than the Planning Office letter, the minutes of the July 13, 2021 meeting, and a June 1, 2021 Planning Office Staff Report (Staff Report) recommending approval, no written findings were issued by the Board.

[¶6]   On August 12, 2021, Monaghan Farms and the Landowners filed separate Petitions for Review in the district court. The district court affirmed the Board's approval of ConnectGen's application. Monaghan Farms and the Landowners timely appeal.

## *STANDARD OF REVIEW*

[¶7]   We review an agency's decision as if it came directly to us, giving no deference to the district court's decision. *HB Fam. Ltd. P'ship v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2020 WY 98, ¶ 32, 468 P.3d 1081, 1091 (Wyo. 2020) (citing *Hardy v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 42, ¶ 10, 394 P.3d 454, 457 (Wyo. 2017)). Because the proceedings before the Board were informal, Wyo. Stat. Ann. § 16-3-114(c)(ii)(A) governs our review. *HB*, ¶ 33, 468 P.3d at 1091. We will set aside an agency decision that is "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Wyo. Stat. Ann. § 16-3-114(c)(ii)(A) (LexisNexis 2021). *See Tayback v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2017 WY 114, ¶ 13, 402 P.3d 984, 988 (Wyo. 2017); *Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 2012 WY 163, ¶ 20, 292 P.3d 855, 861 (Wyo. 2012).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*HB*, ¶¶ 32–35, 468 P.3d at 1091–92 (quoting *Tayback*, ¶ 13, 402 P.3d at 988 (quoting *Wilson*, ¶ 21, 292 P.3d at 861)).

[¶8]   An agency's conclusions of law and interpretation of statutes and their implementing regulations are questions of law that we review de novo. *HB*, ¶ 33, 468 P.3d

3

at 1091; *Powder River Basin Res. Council v. Wyoming Dep't of Env't Quality*, 2010 WY 25, ¶ 6, 226 P.3d 809, 813 (Wyo. 2010). Constitutional questions are questions of law subject to de novo review. *See Accelerated Receivable Sols. v. Hauf*, 2015 WY 71, ¶ 11, 350 P.3d 731, 734 (Wyo. 2015); *Cir. Ct. of Eighth Jud. Dist. v. Lee Newspapers*, 2014 WY 101, ¶ 9, 332 P.3d 523, 527 (Wyo. 2014).

## DISCUSSION

### I. Was ConnectGen required to obtain a conditional use permit in addition to the WECS special use permit?

[¶9]    The Appellants argue that the Albany County Zoning Resolution (ACZR) requires ConnectGen to obtain a conditional use permit in addition to the WECS special use permit. They contend that without a conditional use permit, the Board's approval of the WECS special use permit is "not in accordance with [the] law and must be set aside" pursuant to Wyo. Stat. Ann. § 16-3-114(c)(ii)(A).

[¶10]   Chapter 4 of the ACZR contains a table that "sets forth the land uses allowed for new development in the established zoning districts." ACZR ch. 4, § 1. The table reflects that a conditional use is allowed in areas zoned Agricultural (A) and Industrial (I). It also shows that WECSs are prohibited in all areas except those zoned as A and I, and that a special use permit is required for a WECS. ACZR ch. 4, § 2, Land Use Table 4.1. The segment of the table that addresses WECS is depicted below:

| Land Use Table 4.1 | Zoning Classification | | | | | | | Special Use Standards/Permit |
|---|---|---|---|---|---|---|---|---|
| Uses | A | RR | SLR | UR | C | NB | I | |
| Abbreviation:   A = Allowed by Right   C = Conditional Use Permit   P = Prohibited | | | | | | | | |
| Utility Uses | | | | | | | | |
| Commercial wind energy conversion systems | C | P | P | P | P | P | C | Chapter 5, Section 12 |

According to the ACZR:

> "C" in the cell of the land use table indicates that the use is allowed subject to approval of a conditional use permit. If there are additional standards or a required special use permit pertaining to the use, they are referenced in the far-right column of the land use table. Uses requiring a conditional use permit are subject to all other requirements found in these zoning regulations.

4

ACZR ch. 4, § 2(B). Albany County's commercial wind and solar energy siting regulations contain extensive requirements specific to permitting wind energy systems. *See* ACZR ch. 5, § 12. Conditional use permit requirements are found in ACZR ch. 5, § 7. The requirements for a conditional use permit are in part, duplicative of, and in part, divergent from, the WECS permitting requirements. In places the requirements for a conditional use permit and a WECS permit conflict.[2]

[¶11] At the July 13, 2021 Board meeting, the chairman of the Board expressed the Board's view that a WECS project requires only a special use permit and not a conditional use permit.

> [T]his WECS permit is the conditional use application for this project. Because of all of the different impacts specific to this project or to wind projects that are unique for wind projects, the WECS permit was created so that it included all those conditional use permit application questions as well as all of the specific ones to these projects, and this isn't different from . . . a tower permit application. It's the same way.

---

[2] Illustrative examples include:

Duplicative Requirements: Both the WECS special use permit and the conditional use permit require: an application to the Planning Office, ACZR ch. 5, § 7(D)(1) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(a) (WECS permit); relevant notice, ACZR ch. 5, § 7(D)(2) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(c) (WECS permit); Planning and Zoning Commission review and recommendation, ACZR ch. 5, § 7(D)(3) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(d) (WECS permit); site plans and/or survey maps, ACZR ch. 5, § 7(D)(5)(a) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(f)(1) (WECS permit); proof the proposed use will not affect or overburden County resources, ACZR ch. 5, § 7(D)(5)(c) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(f)(3) (WECS permit); proof the proposed use will not harm the public health, safety and welfare, ACZR ch. 5, § 7(D)(5)(b) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(f)(2) (WECS permit); the applicant addresses economic and social impacts, air quality impacts, water quality impacts, and general nuisance impacts, ACZR ch. 5, § 7(D)(5)(d)(3-8) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(f)(4)(i-iv) (WECS permit); and Board review and action, ACZR ch. 5, § 7(D)(4) (conditional use permit), ACZR ch. 5, § 12, WECS Reg. (F)(4)(e) (WECS permit).

Divergent Requirements: The WECS regulations require the applicant to address concerns not listed in the conditional use permitting application. *See* ACZR ch. 5, § 12: WECS Reg. (F)(4)(f)(4)(v) (soil disturbance); WECS Reg. (F)(4)(f)(4)(vi) (wildlife impacts); WECS Reg. (F)(4)(f)(4)(vii) (cultural resource impacts). Similarly, conditional use permits require an applicant to satisfy concerns not relevant to WECS projects. *See, e.g.*, ACZR ch. 5, § 7(D)(5)(d)(6) (screening and buffering); ACZR ch. 5, § 7(D)(5)(d)(8) (traffic); ACZR ch. 5, § 7(D)(5)(d)(9) (parking); ACZR ch. 5, § 7(D)(5)(d)(10) (exterior lighting); ACZR ch. 5, § 7(D)(5)(d)(11) (refuse); ACZR ch. 5, § 7(D)(5)(d)(12) (signage).

Conflicting Requirements: Portions of the WECS regulations conflict with conditional use regulations. *See, e.g.*, ACZR ch. 5, § 7(C)(1-2) (conditional use permit is void if not used in one year); ACZR ch. 5, § 12, WECS Reg. (F)(6-7) (WECS permit expires within five years if not put to use and can be renewed for an additional five year period).

[¶12] This Court will "defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules." *N. Laramie Range Found. v. Converse Cnty. Bd. of Cnty. Comm'rs*, 2012 WY 158, ¶ 37, 290 P.3d 1063, 1077 (Wyo. 2012) (quoting *Off. of State Lands & Invs. v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 11, 252 P.3d 951, 954 (Wyo. 2011)). In *HB*, we held that:

> An agency is in the best position to determine whether a [conditional use permit] is required. *Bonnie M. Quinn Revocable Tr. v. SRW, Inc.*, 2004 WY 65, ¶ 17, 91 P.3d 146, 151 (Wyo. 2004). At the same time, an "agency's own rules and regulations have the force and effect of law, and an administrative agency must follow its own rules and regulations or face reversal of its action." *Wilson*, ¶ 22, 292 P.3d at 862 (citation and internal quotation marks omitted).

*HB*, ¶¶ 39–40, 468 P.3d at 1093 (affirming Teton County Board of Commissioner's approval of a conditional use permit for use of property as a raptor center and rejecting appellants' argument that a variance was required).

[¶13] Both the Landowners and Monaghan Farms argue that the Chapter 4 language, explaining the use of the table, requires a conditional use permit for all uses where a "C" is shown on the table. They assert other criteria or compliances found in the far right column are required in addition to a conditional use permit. Appellants rely on the first sentence of the ACZR language: "A 'C' in the cell of the land use table indicates that the use is allowed subject to approval of a conditional use permit." ACZR ch. 4, § 2(B). They contend this language unambiguously requires a conditional use permit where a "C" appears in the table. They then turn to the second sentence: "If there are additional standards or a required special use permit pertaining to the use, they are referenced in the far-right column of the land use table." ACZR ch. 4, § 2(B). Appellants contend this language requires a special use permit in addition to the conditional use permit.

[¶14] The ACZR uses the disjunctive "or" in addressing the table. It states that a conditional use permit is required when indicated in the table "**or** a required special use permit pertaining to the use" is necessary when referenced in the far-right column. ACZR ch. 4, § 2B (emphasis added). Special use permit procedures are extensive and require the applicant to meet the general requirements of conditional use permitting but are tailored to the nature of the special use. *Compare* ACZR ch. 5, § 7 (conditional use permit application requirements), *with* ch. 5, § 9 (tower use permit application requirements), *and* ch. 5, § 12 (WECS special use permit application requirements and solar energy special use permit application requirements). A specific statute will control over a general one. *Laramie Cnty. Sch. Dist. No. One v. Cheyenne Newspapers, Inc.*, 2011 WY 55, ¶ 2, 250 P.3d 522, 525 (Wyo. 2011). Here, ACZR ch. 5, § 7 is a more general regulation governing

6

conditional use permits, while ACZR ch. 5, § 12 specifically addresses wind and solar permits.

[¶15]  The Appellants' interpretation of the regulations would require an applicant file two permit applications (one for a conditional use permit, the other for a WECS special use permit).  To be approved, these applications would essentially need to comply with the same standards, differentiated only by requirements specific to wind farms.[3]  Such an interpretation would be a useless formality and require duplicative efforts by the applicant and the Board.  *See Solvay Chems., Inc. v. Wyoming Dep't of Revenue*, 2022 WY 124, ¶ 17, 517 P.3d 1146, 1152 (Wyo. 2022) ("[W]e will not interpret a statute in a way that renders any portion meaningless or in a manner producing absurd results." (quoting *Delcon Partners LLC v. Wyoming Dep't of Revenue*, 2019 WY 106, ¶ 11, 450 P.3d 682, 686 (Wyo. 2019))); *Adekale v. State*, 2015 WY 30, ¶ 13, 344 P.3d 761, 765–66 (Wyo. 2015) ("This Court will not interpret a statute in . . . a manner producing absurd results." (citing *Stutzman v. Off. of Wyoming State Eng'r*, 2006 WY 30, ¶ 16, 130 P.3d 470, 475 (Wyo. 2006))); *see also Wilson*, ¶ 1, 292 P.3d at 858; *State, Dep't of Corr. v. Watts*, 2008 WY 19, ¶ 23, 177 P.3d 793, 799 (Wyo. 2008) ("We construe a statutory provision to harmonize it with other provisions relating to the same subject matter.").  The Board's interpretation—that a conditional use permit is not required because the WECS is the conditional use permit—is reasonable and more consistent with the ACZR as a whole.  *See Matter of Adoption of ATWS*, 2021 WY 62, ¶ 9, 486 P.3d 158, 160 (Wyo. 2021) ("We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia*." (quoting *Matter of Est. of Frank*, 2019 WY 4, ¶ 7, 432 P.3d 885, 887 (Wyo. 2019))).  The ACZR does not require an applicant to obtain a conditional use permit in addition to the WECS special use permit.

## II.  Was the Board's approval of the WECS special use permit application arbitrary and capricious?

[¶16]  Appellants argue that the Board's approval of the ConnectGen WECS special use permit was arbitrary and capricious based on its failure to make certain findings.  Appellants also contend that several of the findings that the Board did make were arbitrary and capricious.  As to the failure to make findings, they assert the Board failed to: (1) "make complete findings, issue an opinion, [and] render a decision"; (2) find that the facility is compatible with all adjacent uses; (3) find that each impact "shall be mitigated and . . . impacts to offsite property owners are minimized"; and (4) find that the facility will not adversely affect public health, safety and welfare.  Monaghan Farms also argues the Board failed to make findings regarding the public's comment on the Project and adopted staff findings of fact and conclusions of law drafted prior to the public hearing.  As to the contention that the findings the Board did make were arbitrary and capricious: (1) Monaghan Farms asserts the Board was required to make separate findings "that

---

[3] *See supra* note 2.

7

identify and discuss[] the evidence submitted by the public"; and (2) the Board lacked a rational basis for its findings that "light, glare, heat, noise, vibration, odors, fumes, smoke, or other nuisances . . . " have been minimized.

[¶17]   We first address the arguments directed at the Board's failure to make findings.  *See* subsection (A), "Did the Board comply with the WECS regulations and Wyoming Statutes as they pertain to findings?"  *Infra* ¶¶ 18–42.  We then turn to the arguments that the findings the Board did make were arbitrary and capricious.  *See* subsection (B), "Were the findings made by the Board arbitrary and capricious?"  *Infra* ¶¶ 43–60.

**A.    Did the Board comply with the WECS regulations and Wyoming Statutes as they pertain to findings?**

**1.  Must the Board's findings be contained in a formal written opinion containing findings of fact and conclusions of law?**

[¶18]   The Appellants contend that the Board failed to "make complete findings, issue an opinion, [and] render a decision" as required by Wyo. Stat. Ann. § 18-5-507(a).[4]  Wyo. Stat. Ann. § 18-5-507(a) provides:

> (a)    Within forty-five (45) days from the date of completion of the hearing required by W.S. 18-5-506, the **board shall**

---

[4] The Landowners argue that the Board's decision was not properly served on ConnectGen as required by both Wyo. Stat. Ann. § 18-5-507(c) and the ACZR.  We do not address this argument as no substantial rights of the Appellants are affected by the Board's compliance with this provision, and they do not have standing to raise this issue.  Wyo. Stat. Ann. § 18-5-507(c) provides: "A copy of the decision shall be served upon the applicant."  *See also* ACZR ch. 5, § 12(F)(4)(e)(3) (The decision "shall be served upon the applicant.").  "The applicant" is ConnectGen.  Whether the Board properly served ConnectGen does not affect the Appellants' substantial rights.  *See, e.g.*, *N. Laramie Range*, ¶ 60, 290 P.3d at 1082–83 ("an error must be prejudicial and affect the substantial rights of the appellant to warrant reversal" (citations omitted)); *In re JW*, 2010 WY 28, ¶ 31, 226 P.3d 873, 881 (Wyo. 2010) (Golden, J., dissenting) (mother lacked standing to assert rights of aunt and uncle); *Pardee v. Kuster*, 15 Wyo. 368, 91 P. 836, 837–38 (1907) (plaintiff had no standing where the error complained of was not prejudicial to plaintiff's substantial rights).  Further, Rule 9.04 of the Wyoming Rules of Appellate Procedure provides, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court."

The Landowners also contend that the Board failed to make a written finding that ConnectGen's application was complete.  Wyo. Stat. Ann. § 18-5-505 states that "[u]pon receipt of an application, the board of county commissioners shall conduct a review of the application to determine if it contains all the information required by W.S. 18-5-503 and any applicable rules and regulations."  Wyo. Stat. Ann. § 18-5-505 (LexisNexis 2021).  Wyo. Stat. Ann. § 18-5-506 requires a hearing to consider public comment within forty-five to sixty days after a determination that an application is complete.  The Landowners assert the lack of a written finding as to the completeness of the application requires this Court to reverse.  We do not find this a colorable argument.  There is no statutory or regulatory requirement for a written determination of completeness.  The Board made an implicit finding of completeness when it set the matter for public hearing.

8

**make complete findings, issue an opinion, render a decision upon the record either granting or denying the application and state whether or not the applicant has met the standards required by this article**. The decision shall be subject to the remedies provided in W.S. 18-5-508. The board shall grant a permit if it determines that the proposed facility complies with all standards properly adopted by the board of county commissioners and the standards required by this article.

Wyo. Stat. Ann. § 18-5-507(a) (LexisNexis 2021) (emphasis added). The ACZR incorporates these requirements. ACZR ch. 5, § 12(F)(4)(e)(3) (The Board "must make a decision to either approve or deny the application[.]").

[¶19] The Appellants argue that the July 16, 2021 letter sent to ConnectGen "confirm[ing] that [ConnectGen's] Rail Tie Wind Project Application WEC-01-21 was approved" cannot satisfy Wyo. Stat. Ann. § 18-5-507(a) because the Board did not make complete findings and the letter does not state ConnectGen met the standards required by the statute. They contend that the letter's language—"The minutes of the July 13th meeting will serve as the official record of this permit"—does not comply with the statute because the meeting minutes contain no findings.

[¶20] "[T]he absence of formal findings does not necessarily require that the case be remanded" to the Board. *Wilson*, ¶ 38, 292 P.3d at 866 (citation omitted). Formal findings are only required in informal administrative proceedings like this one (as opposed to contested case hearings) "if a statute or regulation requires" such findings to be made. *Id.* ¶ 40, 292 P.3d at 866 (When a "statute or regulation requires specific findings, [those findings] must be made.").

[¶21] Neither Wyo. Stat. Ann. § 18-5-507(a) nor the WECS regulations require the findings, opinion, or decision to be in any particular form. Wyo. Stat. Ann. § 18-5-507(a) requires the Board's decision to be "upon the record."[5] The Board made findings "upon the record" at the July 13, 2021 meeting when it incorporated the findings in the Staff Report and approved the WECS permit application. The findings were memorialized in the Board's July 13, 2021 meeting minutes stating the motion to "APPROVE the Rail Tie Wind Project WECS-01-21 based upon and incorporating the Findings of Fact and Conclusions of Law as listed in the Staff Report and considering all conditions agreed upon tonight . . . CARRIED." The Staff Report and the Board's findings incorporating that report are of record.

---

[5] While the statute and regulations do not require the Board's findings, opinion, or decision to be in a formal written opinion, the Board's decision to issue its findings in the manner it did makes our review more cumbersome. *See Wilson*, ¶ 40, 292 P.3d at 866.

9

[¶22] We do not find that the Board abused its discretion or that its decision was arbitrary and capricious when it failed to issue written findings of fact and conclusions of law and instead incorporated the findings of fact and conclusions of law contained in the Staff Report into its decision.

## 2. Did the Board fail to make required findings?

[¶23] The Landowners argue that the Board failed to make the following findings: (a) that each impact is mitigated and impacts to offsite property owners minimized; (b) that the facility is compatible with all adjacent uses; (c) that the facility will not adversely affect public health, safety, and welfare; and (d) that ConnectGen provided required letters of consent from all property owners. Monaghan Farms makes a separate argument: (e) that the Board was required to and failed to make separate findings "that identify and discuss[] the evidence submitted by the public[.]"

### a. Certain Impacts Are Minimized

[¶24] Landowners argue that the ACZR requirement that impacts must be "minimized," means each impact must be reduced to the smallest possible degree and here the Board did not and could not make such a finding.[6] Monaghan Farms makes a similar argument. It contends that the Board lacked a rational basis for finding that the nuisance impacts were minimized. It argues that "minimized" means reduced to "the least quantity permissible." In construing regulations,

> [w]e begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia*. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction.

*Bd. of Cnty. Comm'rs of Cnty. of Campbell v. Rio Tinto Energy Am., Inc.*, 2008 WY 139, ¶ 5, 196 P.3d 791, 793 (Wyo. 2008) (citations omitted) (quoting *BP Am. Prod. Co. v. Dep't of Revenue, State of Wyo.*, 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo. 2005)).

---

[6] Landowners refer to specific impacts identified in the ACZR—economic and social impacts, air quality impacts, water quality impacts, general nuisances (including fire suppression, ice throw, shadow flicker), soil disturbance, wildlife impacts, cultural resource impacts, visual impacts, noise impacts, and lighting impacts.

[¶25] The Appellants take the word minimize out of context. "In construing a zoning ordinance, as in construing any language, the words may not be torn from the sentence in which they appear, the sentence may not be read separate from its paragraph, and a paragraph or section may not be taken from its context." 4 Patricia E. Salkin, *American Law of Zoning* § 41:11 (5th ed. Dec. 2022 update). The regulation requires that if the Board finds a project results in an identified impact that it must also find that impact is "adequately addressed" by the applicant and for some impacts, that the applicant adequately addressed the mitigation or minimization of the impact. ACZR ch. 5, § 12(F)(4)(f)(4).[7] For example, if a project will result in soil disturbance, the regulation

---

[7] The ACZR wind energy regulations set forth the "Application and Approval Process" for commercial wind farms. ACZR ch. 5, § 12(F)(4). A portion of that process addresses the Board's review and decision. ACZR ch. 5, § 12(F)(4)(e). With regard to the "Final Decision," the regulations state: "In order to give final approval of the WECS Project Permit or the solar energy facility, the Board of County Commissioners must be able to make required findings of fact and conclusions of law, **determining that each impact shall be mitigated, if deemed necessary, ensuring compatibility with adjacent uses**." ACZR ch. 5, § 12(F)(4)(e)(3) (emphasis added).

The next section lists "Findings Necessary for Approval." ACZR ch. 5, § 12(F)(4)(f). This section provides:

> The Board of County Commissioners must make the following findings:
> 1) That the Applicant has provided such site plans and/or survey maps as required.
> 2) That the proposed WECS Project or solar energy facility will not adversely affect the public health, safety, and welfare of the community.
> 3) That the proposed WECS Project or solar energy facility shall not adversely affect the public interest by overburdening County services.
> 4) **That the applicant has adequately addressed the following impacts**:
>> i. Economic or Social Impacts: Demonstrate that the applicant has addressed any complaints specified during the public comment period concerning any negative economic or social impacts. In addition, other impacts identified by studies or reports for the project concerning economic or social impact shall be addressed.
>> ii. Air Quality: Mitigate any air quality impact at or beyond the property line: fumes, smoke, odor, dust, heat, etc.
>> iii. Water Quality: Mitigate any water quality impacts.
>> iv. General Nuisances: Minimize light, glare, heat, noise, vibration, odors, fumes, smoke, or other nuisances generated by the WECS Project or solar energy facility that may affect off-site property owners.
>> v. Soil Disturbance: Show that soil disturbance on the site will be minimized and that appropriate measures will be taken to restore disturbed areas to its former state.
>> vi. Wildlife Impacts: Show that the WECS Project or the solar energy facility will not be a significantly negative impact on wildlife species in the area. For WECS Projects specifically, the applicant shall show that their project is consistent with the Wyoming Game and Fish Department's document entitled "Wildlife Protection

requires that the Board find an applicant has "adequately addressed" the minimization of soil disturbance. ACZR ch. 5, § 12(F)(4)(f)(4)(v).

[¶26]  The Staff Report, adopted by the Board, made detailed findings with respect to each impact in the regulation and concluded that ConnectGen "sufficiently addressed" each impact.[8]  As the district court explained, "adequate" as used in the WECS Regulations, and "sufficient" as used in the Staff Report are defined almost identically.  "Adequate" means "sufficient for a specific need or requirement," *see Adequate*, Merriam-Webster Dictionary,  https://www.merriam-webster.com/dictionary/adequate (last visited Apr. 7, 2023), and "sufficient" means "enough to meet the needs of a situation or a proposed end." *See Sufficient*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sufficient (last visited Apr. 7, 2023).  The Board complied with the WECS regulation in making findings regarding impacts when it found that the Project's impacts were "adequately [sufficiently] addressed" by ConnectGen.

### b.  Facility Compatible with All Adjacent Uses

[¶27]  Landowners argue that the Board was required to and did not find "that the industrial wind energy facility is compatible with adjacent uses."  ACZR ch. 5, § 12(F)(4)(e)(3) states, "In order to give final approval of the WECS Project Permit or the solar energy facility, the Board of County Commissioners must be able to make required findings of fact and conclusions of law, determining that each impact shall be mitigated, if deemed necessary, **ensuring** compatibility with adjacent uses."  ACZR ch. 5, § 12(F)(4)(e)(3) (emphasis added).  The Landowners assert that the use of the word "ensure," which means to make certain, requires the Board to make certain that the wind energy facility will be compatible with adjacent uses and that such a finding must be made to approve a wind energy project.

---

Recommendations for Wind Energy Development in Wyoming" (November 17, 2010) and that it will follow recommendations made by the Wyoming Game and Fish Department.  Solar energy facilities will follow recommendations of the Wyoming Game and Fish Department.  Any reports prepared for the Wyoming Industrial Siting Council to address wildlife impacts shall be provided.
vii. Cultural Resource Impacts: Show that appropriate measures will be taken to mitigate disturbance of any cultural resources on the site.  Any reports prepared for the Wyoming Industrial Siting Council to address cultural resource impacts shall be provided.
viii. If this project requires review by Industrial Siting Council, the applicant shall not be required to address vi) Wildlife Impacts or vii) Cultural Resource Impacts of this subsection.
ACZR ch. 5, § 12(F)(4)(f) (emphasis added).
[8] These findings are lengthy and detailed, comprising over eight pages of the Staff Report.

[¶28]   The language relied on by Appellants in ACZR ch. 5, § 12(F)(4)(e)(3) summarizes the requirements the Board must meet to give approval for a WECS including the Board's obligations under ACZR ch. 5, § 12(F)(4).  The very next section of the ACZR sets out in detail the "Findings Necessary for Approval."  ACZR ch. 5, § 12(F)(4)(f) (*see supra* note 7).  ACZR ch. 5, § 12(F)(4)(f)(4) requires the Board to find that an applicant has **adequately** addressed certain impacts (Economic or Social, Air Quality, Water Quality, General Nuisances, Soil Disturbance, Wildlife, and Cultural Resources).  When the provision cited by the Landowners is viewed in context of the regulations as a whole, it is clear that in order to give final approval of the WECS Project permit or the solar energy facility, the Board:

- must be able to make required findings of fact and conclusions of law,
  - o determining that each impact shall be mitigated, if deemed necessary,
  - o **ensuring** compatibility with adjacent uses.

ACZR ch. 5, § 12(F)(4)(e)(3) (emphasis added).

[¶29]   Compliance with the WECS regulation—identifying impacts that require mitigation and determining whether the applicant had adequately addressed mitigation of those impacts—is the tool that ensures compatibility with adjacent uses.  *See* ACZR ch. 5, § 12(F)(4)(f)(4).  The Staff Report adopted by the Board addressed each impact listed in the ACZR and the mitigation proposed by ConnectGen.  The Board approved the Staff Report recommendations including mitigation to minimize impacts.  The Board identified additional mitigation requirements for certain impacts and approved the application subject to conditions that addressed those requirements.  *See supra* ¶¶ 5, 21.  The regulations do not require the Board to separately find compatibility with adjacent uses or mitigation of each impact.

### c.  The Project Will Not Adversely Affect Public Health, Safety, and Welfare

[¶30]   The regulations require that the Board find "[t]hat the proposed WECS Project . . . will not adversely affect the public health, safety, and welfare of the community."  ACZR ch. 5, § 12(F)(4)(f)(2).  The Landowners contend that the Board failed to make a finding that the Project will not adversely affect public health, safety, and welfare of the community.  ConnectGen contends that this finding was made and is set forth in the Staff Report adopted by the Board:

**Findings Necessary for Approval**

.    .    .

13

> 2. The proposed WECS Project shall not adversely affect the public health, safety, and welfare of the community.
> *Staff Position: The applicant has sufficiently addressed the standards of the [ACZR] adopted for the public health, safety and welfare of the community.*

The Board contends that the record substantiates that it acted to ensure that the public's health, safety, and welfare was not adversely affected. The Board argues that its principal tool for protecting the public health, safety, and welfare is compliance with the WECS regulations. Therefore, its approval of ConnectGen's application, with the conditions it imposed, is a "function[al] equivalent" of a finding that the Project "will not adversely affect the public health, safety, and welfare of the community." ACZR ch. 5, § 12(F)(4)(f)(2).

[¶31] When a "regulation requires specific findings, they must be made." *Wilson*, ¶ 40, 292 P.3d at 866. In *Wilson*, the Teton County Board of County Commissioners (Teton County Board) approved an application to develop property located in Wilson, Wyoming. Wilson Advisory Committee, a nonprofit corporation representing citizens concerned about development, appealed. *Id.* ¶ 2, 292 P.3d at 858. The property, upon which the development had been approved, consisted of two parcels—a small parcel zoned commercial, and a large parcel zoned for single family residences. The development plan approved by the Teton County Board called for four residential units, one affordable housing unit, and commercial parking to be built on the large parcel. *Id.* ¶ 7, 292 P.3d at 858. On appeal, the Wilson Advisory Committee argued that the Teton County Board's findings were insufficient. *Id.* ¶ 30, 292 P.3d at 863. The relevant regulation governing development in more than one zoning district allowed commercial development in the larger, residential zoned portion of the property if "it can be demonstrated that the location proposed will improve scenic views and lessen adverse environmental impacts." *Id.* ¶ 34, 292 P.3d at 864. At issue was whether the Teton County Board was required to make specific findings as to the improvement of scenic views and lessening of adverse environmental impacts, or whether its general statement that the project complied with all regulatory requirements would suffice. *Id.* ¶¶ 36, 47, 292 P.3d at 865, 868.

[¶32] The Teton County Board argued that its language—"[t]he application . . . for Final Development Plan Approval complies with all applicable provisions of the Teton County Land Development Regulations as more fully set forth [in] the staff report"—evidenced it had made all necessary findings. *Id.* ¶ 47, 292 P.3d at 867–68. We disagreed. However, we found "[t]hat language might be sufficient to adopt a conclusion made by the staff or Planning Commission if the report contained the proper determination." *Id.* In *Wilson*, we "scrutinize[d] the record for the required findings," and found nothing suggesting the staff or Teton County Board had considered these findings. *Id.* ¶¶ 44, 47, 52, 292 P.3d at 867–69. We remanded the case to the Teton County Board to make the findings if it could.

[¶33] This case is distinguishable from *Wilson*. In *Wilson*, our review of the record indicated the staff report "[did] not even refer to [the] topic" of scenic views and was "not clear as to whether the development's proposed location would lessen adverse environmental impacts over those which might occur if each parcel were developed within the limitations" of their specific zoning categories. *Wilson*, ¶¶ 47, 52, 292 P.3d 868–69. In contrast, here the Staff Report indicates it considered whether the Project adversely affected the health, safety, and welfare of the community, and the Staff Report concluded that ConnectGen met standards adopted to protect the health, safety, and welfare of the community. The record contains additional evidence that the Board considered the Project's adverse effect on public health, safety, and welfare, and concluded that it would not. For example, the Board found:

- The Project will not overburden county services.
- The Project will provide $176 million in tax revenue to the State and the county.
- If nearby property values decreased, the decrease would be negligible.
- Air quality impacts would not exceed state or federal air quality standards.
- Siting of roads would be done to avoid erosion, and a stormwater pollution prevention plan will be developed.
- Shadow flicker will be "minimal and well within acceptable industry standards."
- Noise and vibration during construction will be "within acceptable local, state and federal standards," and the site plan "conforms to the noise standards and setback standards to mitigate noise impact to non-participating property owners."
- ConnectGen will take specific action to "minimize potential impacts to soil."
- ConnectGen will take specific action to "minimize [potential] impacts to wildlife in the area."

In addition,

- The Application was reviewed by the county engineer and Wyoming Department of Transportation to ensure roads would be adequate for construction and project access.
- An emergency response plan was provided.
- High voltage warning signs were required.

The Board complied with the WECS regulations in making a finding that the Project "will not adversely affect the public health, safety, and welfare of the community." Its finding was not arbitrary or capricious.

### d. Letters of Consent from All Property Owners

[¶34]   The Landowners also assert that ConnectGen failed to provide letters of consent to construct from all property owners.  The WECS regulations provide that a "WECS Project Permit application shall contain or be accompanied by . . . [l]etters of consent to construct from all surface property owners on which the WECS Project is located[.]"  ACZR ch. 5, § 12(F)(2)(e).  The Landowners argue that ConnectGen failed to meet this requirement.  They submit that the Board's approval of the Project should be reversed because, given this deficiency, the Project "[d]oes not comply with standards . . . adopted by" Albany County for the construction of wind energy facilities.  Wyo. Stat. Ann. § 18-5-504(a)(i).

[¶35]   The Landowners point to the Staff Report reference to a letter of consent from William and Patricia Kilpatrick.  The Staff Report states that "at the time this staff report was written, [ConnectGen and the Kilpatricks were] in the process of negotiating a lease agreement.  It is anticipated that this will be completed soon, and a proper letter of consent will be provided for use of this property . . . ."  The Staff Report indicated the letter "will need to be provided prior to final approval" by the Board.  *See* ACZR ch. 5, § 12(F)(4)(f)(2).  During the July 13, 2021 Board meeting, Albany County Planner David Gertsch confirmed "[a]ll property owners have provided the required consent letters with the required information.[9]  At the time [the Staff Report] was written, we were still waiting on one of those to be completed to our satisfaction, and it's now been provided."  The Landowners argue that the timing of this consent failed to comply with the WECS regulations because letters of consent are required to be submitted with the application, not later.

[¶36]   The WECS regulations require letters of consent accompany the permit application.  When ConnectGen submitted its application, it had obtained a letter of consent from the Kilpatricks, but the Staff Report indicated it was deficient because the lease had not been fully executed.  In fact, by the time the Staff Report was issued, the lease had been executed.  *Supra* note 9.  In any event, the lease was executed at least a month and a half before the Board rendered its decision on ConnectGen's permit.  The intent of the landowner consent requirement is to confirm that all landowners agree to the WECS Project on their property.  Here, the Kilpatricks provided that consent.  We do not find that the timing of the Kilpatricks' consent rendered the Board's determination to approve the application arbitrary and capricious.

[¶37]   The Landowners also argue that ConnectGen's lease with the State of Wyoming does not satisfy the consent to construct requirement because the Board, in approving the WECS permit, only considered ninety-four turbines on private land, exclusive of the twenty-six turbines to be located on State land and the State was not listed as a landowner on ConnectGen's application.  The Landowners argue that "[b]ecause [State lands were]

---

[9] On May 21, 2021, prior to the issuance of the Staff Report on June 1, 2021, ConnectGen emailed the Board advising that the lease with the Kilpatricks had been executed.  Commissioners Gosar and Ibarra acknowledged receipt of the Kilpatrick lease update.

16

not part of the [approved] WECS Permit . . . , ConnectGen cannot utilize any State [lands] for its wind energy facility."

[¶38] The ACZR applies "to all unincorporated areas within Albany County, Wyoming. State and Federal lands are exempt from this resolution." ACZR ch. 1, § 3. The Staff Report recognized the total number of turbines would be "120 Turbines (94 on private land and 26 on State of Wyoming land)" and recommended "[a]pproval of the WECS Permit application for 94 wind turbines on private land." The State Board of Land Commissioners (SBLC) Rules & Regulations require the SBLC approve all improvements on state lands. SBLC Rules & Regulations, ch. 6, § 10(c)–(d). The SBLC approved the portion of the Project located on state lands and executed a lease for the Project. This lease establishes consent to construct from the State of Wyoming, thus ensuring that the Board was fully aware of the scope of the WECS application.

[¶39] Finally, the Landowners contend letters of consent to construct were required and were not provided by the Union Pacific Railroad and for roads under the jurisdiction of the Wyoming Department of Transportation, the Federal Highway Administration, and Albany County. It is undisputed that none of these parties provided consent. The Landowners argue consent was required because these entities own land that ConnectGen will utilize for roads and improvements in connection with the Project. ConnectGen counters that consents were not required because property owned by the Union Pacific Railroad and roads under the jurisdiction of the Wyoming Department of Transportation, the Federal Highway Administration, and Albany County were not part of the Project.

[¶40] As we stated *supra* ¶ 38, the ACZR exempts state and federal lands. ACZR ch. 1, § 3. The WECS regulations define a "WECS Project" as "[t]he WECSs and associated support facilities including, but not limited to, roads, substations, operations and maintenance buildings, and permanent . . . towers as specified in the siting approval application and including the project area as defined by the Owner." ACZR ch. 5, § 12(B)(12). ConnectGen, the Project owner, defined the Project area, providing legal description of the lands it comprised. Land owned by the Union Pacific Railroad is specifically excluded from the Project area. Similarly, land owned by the Federal Highway Administration is not included in the WECS Application. Accordingly, ConnectGen was not required to obtain consent to construct from those parties.

[¶41] The WECS regulations do not require road use agreements prior to the issuance of a permit. *See* ACZR ch. 5, § 12. Rather, the regulations address the "Use of Roads" in the "Design and Installation" section. There, the regulations set forth requirements for applicants "proposing to use any county, . . . municipal, or state roads[.]" ACZR ch. 5, § 12(G)(9)(a). The Board conditioned the Project's approval upon ConnectGen's submission of a road use agreement with Albany County. The regulations did not require ConnectGen to obtain letters of consent for road use in conjunction with its application.

### e. Evidence Submitted by the Public

[¶42]   Monaghan Farms argues that the Board was required to make separate findings "that identify and discuss[] the evidence submitted by the public." We can find no language in statute or the Albany County regulations requiring specific findings on evidence submitted by the public. *See* Wyo. Stat. Ann. §§ 18-5-501 through -513; ACZR ch. 5, § 12. The Board was not required to make these findings. *See Wilson*, ¶ 42, 292 P.3d at 866–67.[10]

## B.   Were the findings made by the Board arbitrary and capricious?

[¶43]   Monaghan Farms asserts that the adoption of the Staff Report was arbitrary and capricious. In addition, the Appellants argue that certain findings made by the Board were arbitrary and capricious.

### 1.   Was the Board's adoption of the Staff Report arbitrary and capricious?

[¶44]   Monaghan Farms contends that the Board's adoption of the Staff Report was arbitrary and capricious. Monaghan Farms asserts that without separate findings related to public comment, this Court cannot determine whether the Board considered all the facts provided by public comment. The Staff Report was dated June 1, 2021, the same date as the public hearing. Monaghan Farms argues that it is not possible for the Staff Report that was "written before all public comments were received . . . to contain findings of fact that are based on all of the evidence presented to the Board." Monaghan Farms relies on *N. Laramie Range*. There, we held:

> The arbitrary and capricious standard of review requires this Court to give deference to the agency decision and to affirm if the agency reasonably could have made its findings and order based upon all the evidence before it. **In fact, we have described "arbitrary" as "willful and unreasoning action, without consideration and regard for the facts and circumstances presented, and without adequate determining principle."**

*N. Laramie Range*, ¶ 46, 290 P.3d at 1078–79 (emphasis added) (quoting *In re W. Laramie*, 457 P.2d 498, 502 (Wyo. 1969)). Indeed, it would have been arbitrary for the Board to make its decision without considering all the evidence before it. But there is nothing in the record to indicate the Board did not consider the evidence presented in written comments and at the June 1 hearing. The fact that the Staff Report was prepared prior to the public hearing and the receipt of some, but not all, public comment, is not sufficient to show the

---

[10] In a related argument, Monaghan Farms contends that the Board's adoption of the Staff Report was arbitrary and capricious. We address that argument *infra* ¶ 44.

Board's decision was arbitrary or unreasonable. While the Board adopted the Staff Report, it did not do so until the public hearing on July 13, 2021, and after all public comments had been received. In doing so, the Board's decision was informed by public comment and was not arbitrary or capricious.

**2. Did the Board lack a rational basis for finding that nuisances will be minimized?**

[¶45] Monaghan Farms contends that the Board lacked a rational basis when it made findings that "'light, glare, heat, noise, vibration, odors, fumes, smoke, or other nuisances generated by the WECS . . . that may affect off-site property owners' have been minimized." ACZR ch. 5, § 12(F)(4)(f)(4)(iv). The Landowners make similar arguments. We considered Appellants' argument that the Board must find the various impacts minimized earlier. *Supra* ¶¶ 25–33. The arbitrary and capricious standard of review that we apply here "requires only that there be a rational basis for [the Board's] decision." *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 12, 188 P.3d 554, 559 (Wyo. 2008) (citation omitted). To the extent that the Appellants are arguing that the Board lacked a rational basis for finding these impacts were "adequately addressed," we disagree.

**a. Visual and Light Impacts**

[¶46] The Landowners cite a study which found that turbines half the height of ConnectGen's proposed turbines could be visible for up to thirty-six miles. They argue that the viewshed will be destroyed by the number of turbines and the distance from which they will be seen, both in the daylight and at night.

[¶47] The ACZR recognizes that wind "facilities are clearly visible and cannot be hidden from view, however, design consideration should include minimizing the degradation of the visual character of the area[.]" ACZR ch. 5, § 12(A)(2)(b). The ACZR requires the Board to find that "the applicant has adequately addressed . . . General Nuisances" which include light impacts. ACZR ch. 5, § 12(F)(4)(f)(4)(iv); *supra* note 7.

[¶48] In support of its application, ConnectGen submitted a visual impact assessment prepared by Tetra Tech, Inc. (Tetra Tech). The Tetra Tech assessment examined minimum (500 feet) and maximum (675 feet) turbine height scenarios. As explained in ConnectGen's application, the assessment concluded:

> views are primarily limited to within 5 miles of the Project Area to the west, south, and east, with additional areas of potential visibility in relatively higher-elevation areas and extended visibility to the northwest. Potential areas from which the Project may be visible include residences surrounding the Project Area, residential areas along the

southern edge of Laramie, local roads within and adjacent to the Project Area, and portions of major travelways including Interstate 80, U.S. Highways 30 and 287, and Wyoming Highways 130 and 230.

In its application, ConnectGen agreed to address visual impacts by burying collection lines, locating collection lines along access roads, designing the operations and maintenance building with "rural and agricultural elements to minimize contrast with existing structures," designing outdoor facility lighting so that it would be directed downward, and painting turbines with a "light, non-reflective white color."

[¶49]  Regarding lighting impacts, the Landowners cite ConnectGen's application, which states that:

> Nighttime lighting required by the Federal Aviation Administration (FAA) would also introduce visual contrast to the landscape during nighttime hours.  FAA warning lights could be visible for more than 20 miles, depending on atmospheric conditions, and would, therefore, introduce strong impacts within the night sky environment.

In its application, ConnectGen agreed to

> coordinate with the FAA on the feasibility of implementing an Aircraft Detection Lighting System (ADLS) to reduce the potential impact of nighttime lighting . . . . The ADLS would minimize the impact of nighttime obstruction lighting by limiting illumination to only when there is aircraft activity in the vicinity, reducing the duration of night-time illumination.

[¶50]  In approving ConnectGen's permit, the Board found that the turbines and nighttime lighting will affect the viewshed.  In conjunction with its findings on General Nuisances, the Staff Report states:

> Visual Effects.  The wind turbines will be visible within 5 miles of the project and from places with higher elevation.  Required safety lighting will also impact the night sky in the area. [ConnectGen] will be working with the Federal Aviation Administration for the approval of Aircraft Detection Lighting System [ADLS] for the project which will limit illumination of lighting to when aircraft is detected in the vicinity.  This will [lessen] the visual impacts to the night sky[.]

20

[¶51]   The Board conditioned approval as follows: "If an [ADLS] is not approved for this project by the [FAA], ConnectGen (or the current project owner) shall ask for a variance from the [Board] for any affected towers[.]"   The Landowners argue that this condition allows "ConnectGen not to mitigate or minimize the impact, if the FAA determines that ADLS is not appropriate due to aircraft flight patterns or otherwise."   In fact, this condition requires implementation of an ADLS and, if the FAA rejects ADLS, additional oversight by the Board is required.   Inability to comply with this condition, would require ConnectGen to request a variance using the procedures outlined in the ACZR.   Obtaining a variance would require public comment, staff review, and a hearing before any approval by the Board.   ACZR ch. 5, § 14.   The Board's finding that visual impacts have been adequately addressed was not arbitrary and capricious.

### b.  Shadow Flicker

[¶52]   The Appellants also contest the Board's finding that ConnectGen adequately addressed shadow flicker impacts.   "Shadow flicker is the effect of the sun (low on the horizon) shining through the rotating blades of a wind turbine, casting a moving shadow. It will be perceived as a 'flicker' due to the rotating blades repeatedly casting the shadow." Office of Energy Efficiency & Renewable Energy, *Wind Energy Projects and Shadow Flicker,* https://windexchange.energy.gov/projects/shadow-flicker (last visited Apr. 10, 2023).

[¶53]   ConnectGen's application attached a Tetra Tech Shadow Flicker Assessment Technical Report.   Tetra Tech used a computer model to predict the amount of shadow flicker that could occur as a result of the Project.   The results of the model reflect that the maximum amount of shadow flicker a residence of nearby non-participating landowners is likely to experience is 18 hours and 26 minutes per year.[11]

[¶54]   The WECS regulations do not contain a standard for shadow flicker, nor do they specifically mention shadow flicker.   *See* ACZR ch. 5, § 12.   Nevertheless, the Staff Report addressed shadow flicker in its General Nuisance findings:

> Shadow Flicker. [ConnectGen] concluded that those properties potentially impacted by shadow flicker would be below the 30 hours per year threshold that is the industry standard.   A participating property owner in the southern portion of the project area is predicted to have the maximum number of shadow flicker per year at 25 hours and 6 minutes, 0.6 percent of potential daylight hours per year.   [ConnectGen] concluded

---

[11] The Appellants argue that Tetra Tech's shadow flicker assessment was flawed because its analysis did not include the proposed turbine heights.   In fact, Tetra Tech used a variety of turbine heights in its model and reported findings.

21

shadow flicker associated with this project would be minimal and well within acceptable industry standards[.]

In addition to adopting this finding, the Board imposed a condition requiring "ConnectGen [to] work with any property owner claiming to be affected by shadow flicker in excess of the industry standard of 30 hours per year."

[¶55]   The Board's finding that ConnectGen "sufficiently addressed" the impact of general nuisances, including shadow flicker, was not arbitrary and capricious.

### c.  Noise Impacts

[¶56]   The Appellants' briefing implicitly argues that the Board's finding that ConnectGen "has sufficiently addressed" noise impacts was arbitrary and capricious.  The WECS regulations require the Board to find that ConnectGen "adequately addressed" general nuisances, including "noise" "generated by the WECS Project . . . that may affect off-site property owners."  ACZR ch. 5, § 12(F)(4)(f)(4)(iv).  The "Design and Installation" portion of the regulations state: "Noise associated with WECS operation shall not exceed fifty-five (55) dBA as measured at any point along the common property lines between a non-participating property and a participating property."  ACZR ch. 5, § 12(G)(3).

[¶57]   ConnectGen attached an acoustical assessment from Tetra Tech to its application. The acoustical assessment concluded that "[b]ased on the results of the analysis, it is expected that received sound levels at [noise sensitive areas] potentially impacted by the Project will fall below the existing ambient noise levels . . . and will be compliant with the 55 dBA limit prescribed in the Regulations[.]"  Table A-1 in the assessment indicates that sound levels will fall well below the 55 dBA threshold.  During the comment period, a technical memorandum contradicting the Tetra Tech assessment was received. ConnectGen responded to the memo's criticisms and with information refuting them.

[¶58]   In its findings on General Nuisances, the Staff Report states:

> Noise and Vibration. Short term noise impacts may be experienced during the construction phase of the project, but would be within acceptable local, state and federal standards. Vibration associated with the construction phase would not impact any nearby property owners.  If blasting is necessary, a plan would be provided in compliance with any state or local regulations.  [ConnectGen] has provided a noise study and presented a site plan that conforms to the noise standards and setback standards to mitigate noise impact to non-participating property owners.  Noise will not exceed 55 dBA at non-participating property line[s].

22

The Board also imposed conditions to address noise impacts:

> 1.    Turbines will be setback one mile from existing non-participating residential dwellings. This setback may be waived by the affected property owner when done in accordance with the Albany County Zoning Resolution (ACZR), Chapter 5, Section 12, G, 7, i;

> .    .    .

> 3.    Blasting will only occur during daylight hours;

> 4.    If a non-participating property owner suspects noise levels exceed 55 dBA at the property lines (ACZR, Chapter 5, Section 12, G, 3) and this is brought to the attention of ConnectGen (or the current owner of the project) or Albany County, ConnectGen or current owner will take steps to confirm a violation of the standard and rectify it upon its confirmation;

> 5.    Turbines will be setback 1.5 times the height of the nacelle plus the diameter of the turbine blades from public roads[.]

The Landowners argue that Tetra Tech's noise study was not valid because it did not consider the precise location of each turbine and does not demonstrate that it will not exceed the minimum noise standard. The Landowners refer to several studies indicating that noise impacts are detrimental to human health and argue that, based on those studies, sound levels should be "30-40 dBA for safeguarding health, which is consistent with the recommendation of nighttime noise levels by the WHO."

[¶59]   The Board's findings regarding visual impacts, lighting impacts, noise impacts, and shadow flicker resolve questions of fact. The Board's conclusions are supported by the record, are not "unreasoning," or "without consideration and regard for the facts and circumstances presented." *N. Laramie Range*, ¶ 46, 290 P.3d at 1079 (quoting *In re W. Laramie*, 457 P.2d 498, 502 (Wyo. 1969)).

[¶60]   Although the Appellants highlight portions of the record that would support a different conclusion, a difference in opinion is not sufficient to show the Board's decision was arbitrary or capricious. *N. Laramie Range*, ¶ 46, 290 P.3d at 1079 ("While there is evidence in the record from which two different opinions could be derived, 'action is not arbitrary or capricious when exercised honestly and upon due consideration, even though

it may be believed that an erroneous conclusion has been reached.'" (citations omitted)). The Board considered the evidence and determined ConnectGen met the statutory and regulatory requirements for approval of its WECS permit application. In doing so, the Board did not act arbitrarily or capriciously.

### III. Was the Board's approval of the WECS special use permit a taking of private property in violation of Wyo. Const. art. 1, § 32?

[¶61] The Wyoming Constitution prohibits the taking of private property for private use:

> Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation.

Wyo. Const. art. 1, § 32. Monaghan Farms argues that the first condition imposed by the Board violates this provision. That condition requires turbines to be setback "one mile from existing non-participating residential dwellings. This setback may be waived by the affected property owner . . . ." *Supra* ¶ 58. Monaghan Farms currently has no dwellings within one mile of the proposed ConnectGen project. Monaghan Farms argues that "this condition effectively prohibits [it] from constructing any" residential "dwellings in the buffer zone created on [its] property," a use it contends is allowed by statute,[12] and amounts to a taking in violation of Wyo. Const. art. 1, § 32. ConnectGen argues that the condition benefits public health, safety, and welfare, and does not benefit ConnectGen because it limits the potential scope of the wind farm. Therefore, the condition benefits the public and is not a taking for private use. The Board argues that the "buffer zone" has "no impact on Monaghan Farms' right or ability to use its property, but rather limits where ConnectGen can place its turbines . . . ." The Board claims that the "setback protections are in place because they recognize that an existing dwelling cannot be easily relocated to afford greater distance from turbines but do not restrict what a landowner can later build

---

[12] Wyo. Stat. Ann. § 18-5-303(a)(i) exempts certain property from subdivision permitting requirements, including:

> Where the landowner is a business entity and eighty percent (80%) of the ownership interest or shares in the business entity are held by, or in the name of a trust controlled by, individuals related by blood or marriage, the sale or gift may be made subject to the provisions of this section to an immediate family member of any shareholder who has owned at least five percent (5%) of the outstanding shares for at least five (5) years continuously before the date of the sale or gift.

Wyo. Stat. Ann. § 18-5-303(a)(i)(E) (LexisNexis 2021). It is not clear from the record whether Monaghan Farms qualifies under this statute, but for the purposes of the analysis here, the Court will assume it does. In addition, we note that the ACZR allows residential dwellings to be constructed on property zoned Agricultural. ACZR ch. 4, Table 4-1. Monaghan Farms' property is zoned Agricultural.

on its property." In other words, because Monaghan Farms could build a dwelling located within the "buffer zone," there has been no taking.

[¶62]   Monaghan Farms counters that if it were to use all of its land as it is entitled, it, now, must locate any dwellings in compliance with the setback.  The question is whether the condition is an unconstitutional taking for private use.  We answer that question in the negative.

[¶63]   We have recognized three general types of takings: one involves direct government (or private) seizure of property or physical occupation that amounts to a stripping of the owner's possession; the second is known as a per se regulatory taking and occurs when a regulation either causes a physical occupation of property or deprives the owner of all economically beneficial use of his property; and the third occurs in "those situations where the impact of a regulation is deemed to be too severe to be borne without payment of just compensation." *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717, 729 (Wyo. 1985); *see also Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 545 (Iowa 2017).  We address all three types of takings as they pertain to this case.

[¶64]   Physical takings and per se regulatory takings occur when the government or private party "physically occup[ies] all or part of a private estate in land" or when the effect of a regulation causes a direct appropriation or ouster.  *Cheyenne Airport Bd.*, 707 P.2d at 729 (citing *Sheridan Drive-In Theatre, Inc. v. State*, 384 P.2d 597 (1963)).  "If such occupation exists, then just compensation is owed for the interest in exclusive possession that has been appropriated." *Id.* (citing *Sheridan Drive-In Theatre*, 384 P.2d 597).

> Perhaps the clearest example of an inverse condemnation [and physical taking] occurs when the government floods private property without the prior payment of compensation.  *See Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 13 Wall. 166, 20 L.Ed. 557 (1871). Less clear but still covered situations would include intrusions on private property by members of the public pursuant to governmental authorization.  Thus, in *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court held that the federal government could not require the owners of a private marina to allow the public free access without the payment of just compensation.

*Cheyenne Airport Bd.*, 707 P.2d at 729.  A per se regulatory taking occurs when the owner of property suffers a permanent physical invasion, no matter how minor.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538, 125 S.Ct. 2074, 2081, 161 L.Ed.2d 876 (2005) (describing these instances as "per se" "regulatory takings").  An example of a per se regulatory taking can be found in *Loretto v. Teleprompter Manhattan CATV Corp.*  There,

a New York law forced a landlord to allow a cable television company to install cable connection boxes on her property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421–22, 102 S.Ct. 3164, 3168–69, 73 L.Ed.2d 868 (1982). The United States Supreme Court held that because the government authorized a permanent physical occupation of real property, a compensable taking had occurred. *Loretto*, 458 U.S. at 438, 102 S.Ct. at 3177.

[¶65] A regulation that deprives a property owner of all economically beneficial or productive use of his property is also a per se regulatory taking, first recognized in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). In *Lucas*, a developer and owner of coastal property had intended to construct single family residences on the property. *Id.* at 1008, 112 S.Ct. at 2888. The Coastal Council prohibited construction of any habitable dwellings on the property, and the developer sought compensation, arguing the regulation was a taking because he was left with no productive use of the property. *Id.* at 1009, 112 S.Ct. at 2890. The Supreme Court concluded that a taking occurs when a regulation "denies an owner [all] economically [beneficial or productive] use of the land." *Id.* at 1016, 112 S.Ct. at 2894.

[¶66] Monaghan Farms has not established a taking based under a physical occupancy theory or a deprivation of all economic benefit theory. The condition requiring turbines to be set back one mile from existing dwellings does not permanently occupy Monaghan Farms' land. Indeed, Monaghan Farms' use of its land is not limited by the condition. Further, the condition does not deprive Monaghan Farms of all economically beneficial use of its property—Monaghan Farms can continue to use the property as it always has, in its farming operations, and it can build residences within a one-mile radius of turbines if it waives the setback, as allowed in the condition. It can construct other buildings or make any other lawful use of its property. The condition is not a physical taking or a per se regulatory taking.

[¶67] We next consider whether the setback condition is a regulation that goes too far and must be deemed a taking.[13] *See supra* ¶ 61. In *Pennsylvania Coal Co. v. Mahon*, the taking

---

[13] Monaghan Farms relies on the Washington case of *Manufactured Hous. Communities of Washington v. State*. In that case, owners of a mobile home park argued that a statute granting right of first refusal for the sale of mobile home parks to the park tenants was a taking for the tenants' private use, in violation of the Washington State Constitution which, like Wyoming's, provides "Private property shall not be taken for private use . . . ." *Manufactured Hous. Communities of Washington v. State*, 13 P.3d 183, 184–86 (Wash. 2000), *abrogated by Chong Yim v. City of Seattle*, 451 P.3d 675 (Wash. 2019) (quoting Wash. State Const. art. I, § 16 (amend. 9)); *see* Wyo. Const. art. 1, § 32. The Washington Supreme Court held that any regulation that "destroys one or more of the fundamental attributes of ownership (the right to possess, exclude other and to dispose of property)" is a regulatory taking. *Manufactured Hous.*, 13 P.3d at 187. The court concluded that the right of first refusal was a property interest taken for private use in violation of the Washington State Constitution. *Id.* at 196.

clause was expanded to apply beyond the formal eminent domain and inverse condemnation of physical interests in property. Under *Pennsylvania Coal's* balancing test, "a regulation can also be deemed invalid as an uncompensated taking if it goes too far in its restrictions on the *use* of property." *Cheyenne Airport Bd.*, 707 P.2d at 729–31; *see Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) ("if regulation goes too far it will be recognized as a taking").

[¶68] In *Penn Cent. Transp. Co. v. City of New York*, the Supreme Court set forth a multifactored balancing test used to determine whether a regulation "goes too far" and amounts to a taking. *Penn Central* involved the application of New York City's landmark preservation law to the Grand Central Terminal. The law required owners of property designated as a landmark to maintain their properties and prohibited them from altering the exterior of buildings without approval from the Landmarks Preservation Commission. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 111–12, 98 S.Ct. 2646, 2653, 57 L.Ed.2d 631 (1978). The Court explained that there is no "set formula" for determining when "justice and fairness" require compensation to a property owner. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Rather, the inquiry is ad hoc and fact specific. *Id.* The *Penn Central* Court did, however, identify factors of "particular significance":

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the government action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (internal citations omitted). Even when a regulation furthers public policies, it may "so frustrate distinct investment-backed expectations as to amount to a 'taking.'" *Id.* at 127, 98 S.Ct. at 2661. Additionally, when a regulation destroys the "primary expectation" of property owners, a taking may be found. *Id.* at 136, 98 S.Ct. at 2665. The "character of the governmental action" may also be considered in determining whether a taking has occurred. *Lingle*, 544 U.S. at 538–39, 125 S.Ct. at 2081–82.

---

The Washington Supreme Court has since abrogated its decision in *Manufactured Housing*. In *Chong Yim*, the Washington Supreme Court found "that the 'legal underpinnings of our precedent have changed or disappeared altogether'" and adopted the federal regulatory takings analytical framework, *Chong Yim*, 451 P.3d at 682 (citation omitted), which we apply in Wyoming. Moreover, this case is distinguishable from *Manufactured Housing*. Here, Monaghan Farms was not denied any fundamental attribute of ownership by the setback condition and it was not denied any right or ability to use its property.

[¶69]  In *Cheyenne Airport Bd.*, we considered whether a zoning ordinance's impact on private land amounted to a taking.  *Cheyenne Airport Bd.*, 707 P.2d at 729–31.  There, we explained,

> The balancing test and the components of comparison are not rigidly fixed.  However, certain relevant factors can be identified and certain principles as to how these factors should be treated have been established in the Supreme Court opinions.
>
> In assessing the substantiality of the government interest, the courts may be concerned with whether the regulation can be characterized as designed to prevent a harm (the theoretical province of the police power) or intended to secure a benefit (the theoretical province of eminent domain).  If the regulation is deemed to be directed at a potential harm, the courts are then concerned with the harm's imminence, its severity, and how likely the law is to be successful in preventing the harm.  *See* J. Nowak, R. Rotunda, J. Young, Constitutional Law 492; *see also United States v. Caltex*, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); and *United States v. Central Eureka Mining Company*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958), where the regulations were reasonably designed to prevent imminent, severe wartime harms.  The substantial governmental interest in the regulations thus permitted a high degree of impact on private property without exceeding the taking clause limits.
>
> The Supreme Court has clearly stated that the impact to be considered and balanced is the impact of the regulation on the plot as a whole.  The impact of the regulation on discrete segments is not relevant.  In *Penn Central Transportation Co. v. City of New York*, *supra*, the Court said:
>
> > "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.  In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block

designated as the 'landmark site.'" 438 U.S. at 130–131, 98 S.Ct. at 2662–63.

**In assessing the impact of the regulation on the plot as a whole, the more relevant of the elements a restrained landowner can show are: the near-complete frustration of investment-backed expectations; the diminution of the property's market value as a result of regulation; and, perhaps most significantly, the absence of a reasonable remaining economic use.** *See Penn Central Transportation Co. v. City of New York*, *supra*, 438 U.S. at 127–137, 98 S.Ct. at 2660–2666. The plaintiff has the burden of establishing these claims. If he fails to do it, the court will not presume the impact.

*Cheyenne Airport Bd.*, 707 P.2d at 731 (emphasis added). We concluded that the regulation in that case—requiring landowners to remove or trim trees above a certain height—was not a taking.

[¶70] Here, the condition is akin to a zoning regulation,[14] and when we apply the *Penn Central* and *Cheyenne Airport Bd.* factors, we conclude that it does not affect a taking. There is no evidence in the record regarding Monaghan Farm's property values, its investment-backed expectations, or potential lost revenue. Monaghan Farms has not shown that the condition's effect on its property as a whole resulted in a "near-complete frustration" of its "investment-backed expectations," that its property value has significantly been diminished, or that no reasonable economic use remains. *See, e.g., Dodd v. Hood River Cnty.*, 855 P.2d 608 (Or. 1993) (denial of conditional use permit to build a single family dwelling in a forestry zone was not a taking because the regulation did not deny the landowner substantial use of his property); *McElwain v. Cnty. of Flathead*, 811 P.2d 1267 (Mont. 1991) (evidence that landowner could use property for the purposes originally intended, that of building a retirement home, although not as close to the river as he would have liked, precluded finding that a taking had occurred).

---

[14] Zoning is an exercise of police power, which

can be generally described as a government's ability to regulate private activities and property usage without compensation as a means of promoting and protecting the public health, safety, morals and general welfare. *See Weber v. City of Cheyenne*, 55 Wyo. 202, 97 P.2d 667, 670 (1940). Zoning . . . involves the division of land into zones and within these zones the regulation of both the nature of land usage and the physical dimensions of these uses including height setbacks and minimum area.

*Cheyenne Airport Bd.*, 707 P.2d at 726.

[¶71]   We also consider the character of the action.  Here, the purpose of the setback was to create a buffer between existing dwellings and turbines.  This action is not unusual or substantially out of proportion in the context of the WECS approval process.  *See, e.g.*, *Advocs. for Prattsburgh, Inc. v. Steuben Cnty. Indus. Dev. Agency*, 48 A.D.3d 1157, 1158–59, 851 N.Y.S.2d 759 (2008).  In *Advocs. for Prattsburgh*, opponents to a wind project claimed that the setback requirements establishing turbine distances from roads and residences approved by the county's industrial development agency were a de facto taking. The court explained that "acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking with the meaning of the constitutional provision." *Id.*  The court concluded that because the wind turbines would be situated on land leased or purchased by the wind developer, and because the setback requirements do not place any restrictions on property owners who do not consent to having turbines on their land, the setback requirements did not amount to a taking.  *Id.*

[¶72]   Monaghan Farms has not established a taking of private property for private use under Wyo. Const. art. 1, § 32.

## *CONCLUSION*

[¶73]   For the reasons set forth in this opinion, ConnectGen was not required to obtain a conditional use permit in addition to the WECS special use permit.  The Board's approval of the WECS special use permit application was not arbitrary and capricious and was not a taking of private property in violation of Wyo. Const. art. 1, § 32.  We affirm.

30